## BANK OF COMMERCE *v.* GOOLSBY.

## Opinion delivered May 28, 1917.

1. CORPORATIONS—STOCK SUBSCRIPTIONS—TAKING NOTES IN PAYMENT.— The terms of Art. 12, §, 8, Const. 1874, which provides that "no private corporation shall issue stocks or bonds except for money or property actually received or labor done," is violated when notes are taken by the corporation in payment for stock.

2. CORPORATIONS—ANNUAL STATEMENT—DUTY OF DIRECTORS.—While it is primarily the duty of the president and secretary of a corporation to make the annual statement required by the statute, yet the directors who have control over the corporation are negligent if they knowingly permit the officers to make a false report.

3. BANKS AND BANKING—DUTY AND LIABILITY OF DIRECTORS.—Directors of a bank are required to supervise its business and the acts of its officers, and will be liable for a loss occasioned by the misconduct of its officers where they expressly authorize or knowingly permit or acquiesce in such conduct.   This liability extends to both creditors and stockholders sustaining losses.

4. BANKS AND BANKING—LIABILITY OF DIRECTORS TO STOCKHOLDERS.— The directors of a bank may be liable to the stockholders of a bank for losses occasioned by the mismanagement of the bank's officers, where the directors did not exercise due care in supervising the conduct of the bank's business.

5. BANKS AND BANKING—LOSSES—LIABILITY OF DIRECTORS.—The directors of a bank held liable for losses occasioned by the improper management of the bank, in making worthless loans, in making false statements of the bank's affairs, and in issuing stock of the bank to persons who gave only worthless notes in payment therefor.

6. CORPORATIONS—LIABILITY OF DIRECTOR—MISCONDUCT.—One who is not elected a director of a corporation, or if elected was not notified, or if he did not accept the election and did not participate in the board's meetings, is not liable as a director.

7. CORPORATIONS—ASSESSMENT ON STOCK—ACT OF STOCKHOLDERS— LIABILITY OF DIRECTORS.—The directors of a bank will not be liable to its stockholders for the loss of an assessment on their stock paid by them, when with knowledge of the bank's failing condition, the stockholders themselves voted to levy and pay the assessment.

8. CORPORATIONS—FAILURE—LIABILITY OF DIRECTORS TO STOCK-HOLDERS—INTEREST.—Where directors of a bank are liable to stockholders for loss of the stock due to mismanagement, the stockholders may collect interest only from the date that the stock was rendered worthless.

Appeal from Sebastian Chancery Court, Fort Smith District; *Wm. A. Falconer,* Chancellor; affirmed.

*Walker & Walker, T. B. Pryor* and *B. R. Davidson,* for all the appellants.

1. The law does not contemplate payment for stock when subscribed—it may be paid for in future installments when called for. The bank had a lien on the stock. Kirby's Digest, § § 855, 848, 847, 865-6-8. Stockholders had the right to sue other stockholders failing to pay for their stock. 96 Ark. 281. The directors were not asked to bring suit. 97 Ark. 522. The remedy against the stockholders delinquent must first be exhausted. 95 Ark. 124.

2. There is no proof that the directors accepted the return of stock to the bank without authority of the stockholders. No injury is shown by accepting unpaid-for stock from insolvent parties. They had authority under the law to do so.

3. The annual reports were for the public and not for the stockholders, and failure to report only renders the president and secretary liable. Kirby's Digest, § § 848-859; 68 Ark. 433-6; 75 *Id.* 107.

4. No negligence is shown on the part of the directors while Pyle was in office. 141 U. S. 132.

5. The books were properly audited and only a few small discrepancies were discovered. The expenses were not unusually large, nor the salaries exorbitant. The Halstead business did not wreck the bank. The stockholders had the right to investigate the books—they were present at the meeting. Even false entries do not bind a director as to a stockholder, unless fraudulently made to deceive him. 62 Ark. 33-43. Directors are not liable for the frauds of managers without active participation, or wilful or negligent violation of duty. Woods Field on Corp., § § 158, 152. When a director acts as manager, etc., he is entitled to compensation. 86 Ark. 608. Directors are stockholders and not liable for mistakes in judgment, if honest. 71 Penn. St. 11.

6. Plaintiffs do not rely upon any action taken by the board of directors, as such, but upon individual statements made by individual directors in no way connected with board meetings. 23 Atl. 426. A director can only act in connection with the board. Clark on Corp., p. 489, § 193. Each director is answerable for his own act. Beach Priv. Corp. 420, § 254. No neglect is shown. Clark on Corp., § 203.

7. This case is based largely, if not altogether, on individual statements of directors which it is claimed were incorrect, misleading or untrue. Statements of this character are not actionable as against a board of directors. If false and fraudulent they only warrant a recovery by action of deceit against the individual and the statements must be proven false, etc. 71 Ark. 305-9; 38 S. W. 144; 106 Wis. 574; 82 N. W. 546. See also 36 Fed. 617; 65 Id. 932; 75 Id. 781-5; 78 Id. 558; 80 Id. 590; 68 Ark. 459; 141 U. S. 132, etc.

8. A suit of this character does not lie. 54 Fed. 985; 108 Fed. 909; 93 Ark. 112. Failure to file the annual certificates creates a liability at law, and does not give equity jurisdiction. 99 Ark. 51-56. See also 96 Ark. 268-274. Many other points are made and authorities cited, but the briefs are too long and numerous to cite further. The record is full of individual statements to individuals, on which the findings were based; all of which were objected to and there was no testimony to warrant a decree of the character rendered here. The sales of stock were not made in violation of law. 71 Ark. 379; 120 U. S. 287, etc.

*Daniel Hon,* for appellee, Lora Goolsby.

1. The stock, property, affairs, business and management of a corporation are placed in the hands and under the care of the directors. Kirby's Digest, § 841. They are jointly and severally liable for filing a false certificate showing that the capital stock was fully paid in, when it was not. 92 Ark. 416; U. S. Advance Opin-

ions, May 1, 1916, *Law. Co-Op. Pub. Co.,* 429; *Jones Nat. Bk.* v. *Yates,* 95 Ark. 124, etc.

Our law requires the capital stock to be paid in cash. Act 113, Acts 1913, § § 18, 24.

The directors are presumed to know the condition of the bank. 3 A. & E. Enc. Law, 843. They are liable if they transcend or abuse their powers. *Ib.* 845. They are liable * * * to stockholders for loss occasioned by their failure of duty. 21 *Id.* 784, 875, 894-6; 54 Am. St. 719, 725; 71 *Id.* 615. They are bound to know all that is done by the bank; its rules, systems and course of general procedure, etc., and must use ordinary care and diligence to know the conduct of its subordinate officers, as well as what the bank books show, etc. Cases *supra;* 168 N. Y. 157; 85 Am. St. 667; 1 Chy. (L. R.) 161-9. Without considering the falsifying of the records and the false reports made, sworn to and filed, the inattention and negligence of the directors, through which the bank failed and the stock became worthless, made the directors liable to the stockholders. 74 Ark. 585; 95 *Id.* 124; 92 *Id.* 327; 110 *Id.* 39; 97 *Id.* 522.

2. On the cross-appeal cites 1 Lansing (N. Y.) 381; cases *supra.*

3. The decree of the chancellor on the main appeal is right. 44 Ark. 25, etc., etc.

*Winchester & Martin,* for Z. L. and Mary B. Reagan and L. V. Parker.

We simply supplement the brief of Judge Hon by saying that the findings of the chancellor are fully sustained by the evidence. The bad faith and false representations on the part of the directors resulted in the failure of the bank and clearly made them liable. Authorities cited, *supra.*

*H. C. Mechem,* for E. H. Bruce and J. M. Hughey.

1. Bruce purchased his stock in reliance upon the first annual report of the corporation, showing a profit when there had been actually a loss of more than

$2,000.00. Morton either falsified the books or had it done for the express purpose of deceiving the public. Morton is certainly liable to Bruce. 92 Ky. 176.

Mayes is also liable, as it was his duty to know what the books disclosed as to its business, before he made the report. In addition to the cases cited by Judge Hon, see 61 N. E. 567; 24 S. E. 478; 1 Cook on Corp. (6 ed.) § 3252.

2. Both Bruce and Hughey are entitled to judgment against Morton, Fulbright, Mayes and Peel, for selling stock to insolvent persons on credit and reporting it as paid up. Const. Art. 12, § 8; 71 Ark. 379; 8 N. Y. App. Div. 427; 134 Fed. (C. C. A.) 343; 102 Tex. 207; 170 S. W. 642; 72 Cal. 55; 103 *Id.* 624; 142 S. W. 96; 188 *Id.* 513. Notes are not money, nor payment within the meaning of the law. See also 90 Pac. 169; 117 Wis. 382; 2 So. 727, etc. The case 141 U. S. 132 has not been followed in this State. Ark. cases, *supra*; 110 Ark. 139; 95 *Id.* 124, etc. The continued absence of Fulbright rendered him liable. 232 Fed. 758.

The complaint of Bruce and Hughey particularly urge the German-Halstead business and contend that it grew out of a failure of the directors to know the character of business carried on—a partnership in a pawn shop making usurious loans. The decree should be affirmed as to Bruce and Hughey.

*Holland & Holland,* for John H. Holland, M. S. Buckley, J. F. Wright and Herbert Wright.

1. Adopt the brief of Judge Hon and cite as to liability of the directors for at least lack of care, attention and supervision that the law enjoins. 92 Ark. 327; 95 *Id.* 124; 110 *Id.* 39. The payments by Lora Goolsby *et al.* were voluntary and made after full knowledge and no recovery could be had on their cross-appeal.

*G. C. & Joe Hardin,* for Mrs. E. D. Vann.

Adopt the briefs for appellee, *supra.*

*A. A. McDonald,* for I. N. Johnson.

Adopts the arguments and briefs filed for appellees, and cites 99 Ark. 438; 101 *Id.* 95; 64 *Id.* 627; 6 Am. Dec. 207; 1 Am. & E. Enc. Law · (2 ed.) 1058; 44 S. W. 454-8.

### STATEMENT BY THE COURT.

On the 21st of November, 1910, a bank was duly incorporated under the name of "Day and Night Bank," and its place of business was Fort Smith, Arkansas. It had an authorized capital stock of $50,000. The name of the bank was afterwards changed to that of "Bank of Commerce," hereafter called the bank.

In November, 1914, the bank, under the direction of the State Bank Commissioner, went into liquidation and transferred all of its assets to the City National Bank of Fort Smith.

Separate suits were instituted by Lora Goolsby, John Holland and M. S. Buckley, who were stockholders in the bank, against the directors and certain other stockholders. For cause of action the plaintiffs alleged that stock had been subscribed by various persons amounting in the aggregate to $14,475.00 that had not been paid; that the directors had negligently failed to collect the delinquent stock subscriptions, but, on the contrary, had accepted return of the stock from a number of the subscribers; that notwithstanding the uncollected stock, the bank and the directors, through the officers of the bank, filed an annual certificate reporting that the full amount of capital stock paid in was $50,000; that the directors employed one C. L. Pyle as cashier and issued to him 120 shares of stock without his paying therefor and accepted his note for the same, which they never collected, although he was on a salary until the early part of 1914; that the directors negligently and purposely failed to give attention to and take control of the bank during the incumbency of Pyle, the cashier, and allowed him to recklessly dispose of the assets of the bank in making

worthless loans, thereby reducing the bank's assets to such an extent that the Bank Commissioner, in 1914, required an assessment of 50 per cent. against the stockholders.

All the complaints contained substantially the same allegations, Mrs. Goolsby alleging, as an additional cause of action, that the officers in charge of the bank had represented that the payment of the 50 per cent. assessment which had been voted at a call meeting of the stockholders would place the bank in a position to carry on its business successfully and to make dividends for the stockholders, and that she, not knowing of the mismanagement previously, had on August 1, 1914, paid the assessment of 50 per cent., amounting to $1,000.00.

Plaintiffs prayed judgment for the amount paid for their stock, respectively, against the bank and the directors, jointly and severally, and against the delinquent stockholders, severally, to the amounts respectively of their unpaid subscriptions for stock.

During the proceedings the court entered an order to the effect that the complaints filed should be treated as filed on behalf of all other parties who might wish to intervene, to the end that all matters connected with the litigation might be settled in one suit. Whereupon Z. L. Reagan, Mary B. Reagan, L. V. Parker, J. M. Hughey, E. H. Bruce, Tumblin & Joyce, I. N. Johnson, J. F. Wright, Herbert Wright, Lawrence Wright, and A. N. Cole intervened. They adopted the allegations of Lora Goolsby as to the alleged grounds of liability of the defendants. Each of these who had subscribed and paid for stock and paid the assessment, as well as those who had subscribed for stock which they had not paid for, set out their claims respectively.

The bank and those sued as directors thereof, as well as those who were sued as delinquent stockholders, for the most part filed answers, in which all the material allegations of the complaint as to negligence of the directors in the management of the bank and the alleged

grounds of liability as to them were specifically denied. We deem it unnecessary here to set out the respective answers of each of those who are named as parties defendant. We will refer later on to the different phases of the evidence affecting the individual interests of the various parties litigant who have appealed from the decree of the court.

The court consolidated the causes for trial, made the City National Bank of Fort Smith a party defendant, appointed a trustee and receiver and directed the City National Bank to turn over to him all the assets in its hands, which it held as collateral to secure its claim against the bank. The receiver was given full authority to act as he deemed fit in handling the assets for the benefit of all concerned. A master was also appointed to state an account of the condition and affairs of the bank, and he was directed to make a comprehensive report, and to include in it, after enumerating many things, "such other facts as will enable the court to determine the character of the management of the bank and to determine the cause of such bank going into liquidation," and the direction stated that "after the report was submitted that the parties would have an opportunity to introduce such further testimony as they desired."

The master made his report, which was duly made a part of the record, and all the evidence in the cause was, by order of the court and by consent of all parties, heard before the court, and the cause was submitted upon the pleadings, the report of the master and the evidence taken before the court.

The court found that there were outstanding unpaid notes given for stock subscriptions amounting in the aggregate to $12,126.76 and rendered judgment in favor of the bank against each of the parties for the respective amounts of their notes, with interest, towit: J. H. Frost, $1,151.38; E. B. Russum, $1,350.00; A. N. Cole, $1,151.38; J. O. Gunter, $275.00; C. L. Pyle, $2,800.00;

W. H. Cole, $118.00; R. O. Herbert, $1,375.00; Alta Blaylock, $248.00; R. T. Powell, $558.00; Lawrence Wright, $1,365.00; R. P. Davis, $550.00; E. D. Vann, $518.00, and J. O. Johnson, $667.00. The court decreed that the parties against whom these judgments were rendered in favor of the bank should each of them have a judgment over against directors Jay Fulbright, S. W. Peel, R. O. Herbert, W. H. Morton, J. F. Mayes, and C. L. Pyle, for the amounts of the judgments against them respectively, provided they first satisfied the judgments rendered against each of them respectively in favor of the bank. Among those against whom judgments were entered in favor of the bank for unpaid subscriptions for stock were A. N. Cole and J. H. Frost. R. O. Herbert was among those who had executed his note in the sum of $1,000 for stock, and C. L. Pyle had executed his note to the bank for borrowed money which was used in payment of his stock in the sum of $2,800.

The court having found that the following plaintiffs and interveners had subscribed and paid for stock, rendered judgments in their favor respectively against the directors and the Bank of Commerce for the amounts paid for their stock, with interest at 6 per cent. per annum from December 31, 1913, as follows: Lora Goolsby, $2,280.00; John H. Holland, $1,140.00; M. S. Buckley, $1,140.00; Z. L. Reagan, $1,140.00; Mary B. Reagan, $1,140.00; L. V. Parker, $570.00; J. M. Hughey, $1,420.00; E. H. Bruce, $2,145.00; Tumblin & Joyce, $281.45; J. F. Wright, $570.00; Herbert Wright, $570.00; I. N. Johnson, $570.00; and also a separate judgment in favor of Johnson against J. F. Mayes, in the sum of $250.00, with 6 per cent. interest from July 30, 1914, amounting in the aggregate to $275.00.

The court found that on August 1, 1914, Lora Goolsby paid an assessment of 50 per cent. on her stock, amounting to $500 on the representations made by the officers of the bank that such assessment would place the bank in a position to carry on the business successfully,

and upon the representation of Mayes, who at the time was president of the bank, that the other stockholders were paying their assessments; that when she made such payment she was ignorant of any negligent or reckless management of the affairs of the bank. The court also found that the interveners Z. L. Reagan, Mary B. Reagan, L. V. Parker, and I. N. Johnson paid the 50 per cent. assessment on their stock under the same circumstances, except as to certain representations made by Mayes to Johnson, which will be referred to hereafter.

The court found that the payment of these assessments was voluntary except as to Johnson, and entered a decree dismissing the claims of the plaintiffs and certain interveners for the amount of such assessments and canceling such notes as had been executed by stockholders for such assessments.

S. W. Peel, J. F. Mayes, Jay Fulbright and J. H. Morton appealed from the judgments against them; and A. N. Cole and J. H. Frost appealed from the judgments against them. Mrs. Lora Goolsby, Z. L. Reagan, Mary B. Reagan, L. V. Parker and I. N. Johnston, took a cross-appeal from the judgment dismissing their claims for the 50 per cent. assessment paid by them on their stock and the decree canceling all of the outstanding notes that had been given by stockholders for such assessments.

The decree against the directors was based on the following finding of fact by the court: "That during the years 1912 and 1913 the stock of the bank was rendered worthless through inattention, failure to perform, and, neglect of, their duties; that the directors permitted C. L. Pyle, the cashier of the bank, to carelessly dissipate the assets of the bank in making bad loans, which were never collected and were uncollectible when made, and in converting the business of the bank, largely, into a pawnshop, and in cashing worthless checks, and in permitting excessive overdrafts; that all of the di-

rectors were negligent in not pressing the collection of unpaid subscriptions to stock which had been issued to subscribers; that the various negligences caused a loss to the bank exceeding in amount the sums for which the plaintiffs and interveners had recovered judgment; that on account of the negligence of the directors its stock had had no value since the 31st of December, 1913.''

The salient features of the evidence are substantially as follows: The bank began business January 2, 1911. The full amount of the stock subscribed was issued to various persons. Notes aggregating nearly $14,000 were executed by various persons for stock, which at the time the bank went into liquidation had not been collected and which the directors had not attempted to collect by suit, for the reason that, after discussing it, and after finding that the bank was in a ''shaky condition,'' the directors regarded it as the wiser policy to collect these notes without suit, and therefore instructed the officers of the bank to collect all they could. A large per cent. of these notes were worthless when they were accepted in payment for stock, and no security was asked or demanded by the directors for this unpaid balance on stock.

The first annual statement, filed February 5, 1912, showing the financial condition of the bank at the close of business for the year 1911, which was signed and sworn to by the president and the cashier, showed a paid-up capital of $40,850, and the financial statements for the years 1912, 1913 and 1914, which were signed and sworn to by the officers, showed a paid-up capital of $50,000.

The first annual statement showed a profit of $367.20, whereas a true statement would have shown a loss of $2,166. The statement showing the profit was arrived at by arbitrarily charging off the amount of $533.36 from the expense account and adding it to the furniture and fixtures account on February 14, 1911, and

on October 2, 1911, transferring the sum of $2,000 from the expense account to the furniture and fixtures account. These were false entries, as there was no purchase of furniture and fixtures to represent such increase in the furniture and fixtures account. The president testified that he had no knowledge of the item when the statement was filed; that it was made up by the cashier, who explained by saying that it was not the purpose to advertise to the public and patrons of the bank that there had been any loss. No formal action was taken on it by the board of directors, but it was discussed freely. They all knew it afterwards, and it went into the subsequent statements. The cashier said they would charge it back just as soon as the bank had any surplus against which to charge it, but that was never done when the account afterwards showed a surplus. After testifying that it was discussed freely, and that he was under the impression that the directors knew of it, he was asked why they did not want the public to know the facts whatever they were, and answered: "They were seeking to build up the bank, and they figured they would not make any money to begin with, anyway, and that if it was shown that they did not make any money that would preclude the possibility to do so." He further testified that there was no purpose of misleading anybody to their loss. Morton made no explanation of this false entry in the books other than to say that when his attention was called to it he had said he did not think it was correct; that there was a mistake.

After the bank had been in operation about four months, C. L. Pyle was elected by the directors as cashier to take the place of C. M. Morton, who had resigned on account of ill health. Morton sold Pyle $2,000 of his individual stock. Pyle borrowed money from the bank to pay for the stock, executing his note, which was accepted without security. Pyle resided at Clarkesville before moving to Fort Smith, and the directors, before employing him as cashier, made inquiry concerning his qualifications and

received favorable answers. Pyle, however, at the time he executed his note to the bank was wholly insolvent. He stated that he had transferred all of the property he had at Clarksville for what he owed and that he went to Fort Smith considerably involved, but did not know whether the directors of the bank knew it. He was paid a salary of $2,000 per annum, which, during his employment with the bank, amounted to the aggregate sum of $5,873. He had never paid anything on the notes for the money which he had borrowed from the bank, nor the accumulated interest on same.

In January, 1912, as cashier of the bank, Pyle commenced loaning money to one Halstead, who was a pawnbroker located in an office on the second floor of the bank building. The notes were in small amounts. Pyle explained his transactions as to the Halstead paper, and the directors' connection therewith, as follows: "Halstead made the loans, and when he had accumulated several notes he would bring them into the bank with Mr. German's indorsement and I would enter them on the register. I knew, and the directors certainly knew that we were loaning on this chattel security. We had additional collateral—bills of sale and chattel mortgages. Mr. German and Halstead said they gave us one-half the discount. If they charged a man $1.00 for a loan, we would discount it fifty cents; I merely took his word for the amount; usually it would appear on the face of the note. Discount register was supposed to show one-half the amount he had charged. In May, 1912, we held a meeting of the directors and every note was checked over, especially the Halstead paper. I think we had on hand of that paper about $6,000 on May 9, 1912. Four or five months after we began buying the paper the notes were all O. K. and no criticisms were made to any of the notes I had taken up to that time. Sometimes Mr. Morton and Herbert and myself were present and checked up the loans. I continued to buy the paper. Then in the fall of 1912 we had another meet-

ing and same committee audited the books, and at that time we had something like $13,500 of Halstead paper on hand, and some of the directors merely asked me to go through the paper and see how much Halstead paper we had. There was no criticism at the time, and no reason for criticism. They were aware of the fact that I was buying. Col. Peel was here during the summer, in my office every day right by my side, and Mr. Halstead sat there quite often and conversed with Col. Peel about the enormous business he was doing in making these loans. When we had about $13,000 I thought that was enough of that kind of paper and I had caught Halstead doing a little crooked work, began to lose confidence in him, and did not increase the loan. A few months after that Mr. Mayes suggested that we had better not handle any more of that sort of business. I told him I had quit that some time ago. I thought all the time it was not first-class banking, but the notes were for small amounts, with the recommendation that we had of Mr. German, who was well known here.''

It was shown that Halstead had taken as pledges to secure these notes which Pyle accepted various articles of cheap jewelry, and that Pyle, as cashier of the bank, had accepted such articles as additional security to notes amounting to $476. This fact, however, the president, Mayes, testified was not made known to the bank and was not presented to the bank until after the taking of the Halstead notes had been discontinued and an effort had been made to collect them, which failed.

Before accepting the notes with German as endorser, Pyle conferred with Handlin, who was an officer in one of the largest banks in the city of Fort Smith, and a stockholder in the Bank of Commerce, and Handlin reported that German was financially responsible. He did not attempt to ascertain for what sum German's endorsement would be good.

It was shown on behalf of the bank and the directors that they were proceeding with the collection of

these notes until a controversy arose between Halstead and the bank in which Halstead brought suit, asking a restraining order to prevent the collection of the notes, and for a trustee to take charge, alleging that there was a verbal contract under which the bank was to loan the money, and that Halstead was to have charge of the soliciting and collecting, and that the president of the bank had repudiated the contract. The effect of the notice of that suit was to stop collection of the notes.

The testimony of the master tended to show that the value of the assets of the bank, after the same went into liquidation, was about $25,000. He estimated the loss at $59,233.12. Over $10,000 represented the expenses in excess of earnings. The overdrafts amounted to $2,007.13. There was a loss on loans made on stock of $6,150.00; worthless loans, to persons who were insolvent at the time the loans were made, $15,900; the Halstead loans, that were worthless from the beginning, $8,851.03; expenses paid and erroneously charged to fixtures, $2,533.36; total, $35,441.52. Some of the loans were good when made, but were lost on account of the failure to collect same when they could have been collected.

There was a meeting of the board of directors in 1912, at which a committee was appointed to go over the affairs of the bank, and this committee reported that the assets were equal to the liabilities and the bank in a healthy condition. March 2, 1914, the committee reported a depreciation of the assets of something over $15,000. It was customary to have discount boards of banks to meet at least once a month and have cashier's report. Generally two or three members of the board of directors ought to be in the bank and discuss with the cashier the loans. There was no record of the meetings of such board, or of such committee. Five or six hundred dollars of the notes designated as the "Halstead loans" ranged from two to twenty-five dollars, and might have been collected if the trouble with

Halstead had not come up, but no one could make the makers pay by law because of the usurious interest. The rate charged on these small loans was in excess of 10 per cent. Witness thought it was a mistake to launch the Bank of Commerce at the time, because it could not be run properly on an expense of less than $10,000 a year, and a bank of that size could not stand competition. Witness did not "think they were subject to criticism for the amount of expenses. When expenses exceed income they should shut up." Witness testified that German bore a good reputation and was generally considered good for his obligations. Witness regarded him as good for three, four or five hundred dollars.

The leaves covering the entry of the proceedings of the board of directors for 1913 had been extracted from the book of minutes.

The directors testified at length in explanation of their conduct in managing the affairs of the bank, which, from the viewpoint of their counsel, exonerated them from actionable negligence. The record is exceedingly voluminous, and we will not set out and discuss this testimony in detail, for we have reached the conclusion that the facts above set forth, are not susceptible of any explanation that could in law excuse the conduct of the directors, and that the court was fully justified, from a decided preponderance of the evidence, in holding that the directors "are chargeable with actionable negligence in failing to control and manage the business and affairs of said bank as required of them by law." Other facts stated in the opinion.

WOOD, J., (after stating the facts). Section 8, Article 12 of our Constitution provides, "No private corporation shall issue stocks or bonds except for money or property actually received or labor done."

The management of the affairs of every business corporation is under the care and control of its board of directors. The above plain provision of our Constitu-

tion is for the protection of stockholders, as well as creditors and all who are interested in the financial affairs of private corporations. This wholesome provision of our Constitution is a guarantee to all who are financially interested in private business corporations, against the issuance of what is termed "watered stock," that is "stock which purports to be paid in full but which, in fact, has not been paid for."

(1) When notes are taken in exchange for stock it is a palpable violation of the constitutional provision, because notes are merely evidences of indebtedness, and such a transaction shows upon its face that the stock has not been paid for. The design of the framers of the Constitution was that stock should not be issued and sold except for its value in money or property actually received, or labor done. A note is not property in the sense of the Constitution, because it only indicates that the stock has not, in fact, been paid for, and where the notes are worthless the stock has been exchanged for nothing. Notes are not money and not bankable paper, but mere choses in action and it in no sense meets the requirements of the above provision of the Constitution to accept a note in exchange for stock. *In re Waterloo Organ Co.*, 134 Fed. 341, 343; *San Antonio Irrigation Co. v. Deutschman*, 102 Tex. 201, 207; *Bennett* v. *Stuart*, 170 S. W. 642; *Jefferson et al.* v. *Hewitt et al.*, 103 Cal. 624; *Mason* v. *First National Bank* (Tex.), 156 S. W. 366; *McCarthy et al.* v. *Texas Loan & Guaranty Co.*, 142 S. W. 96; *Prudential Life Ins. Co.* v. *Pearson*, 188 S. W. 513; *Williams* v. *Brewster*, 117 Wis. 382; *Lighty* v. *Turnpike Co.*, 14 Serg. & R. (Pa.) 434; *Fitzpatrick* v. *Dispatch Pub. Co.*, 2 So. 727; *Coddington* v. *Canaday*, 61 N. E. 567; *Minge* v. *Clark et al.*, 67 So. 510; 4 Thompson on Corporations, § 3940. See also *Wait* v. *McKee*, 95 Ark. 129.

Stock was issued to various persons in the sum of about $14,000 and notes accepted in payment therefor, which had not been collected at the time the bank went

into liquidation. If the directors, as the governing board having the sole management of the issuance of this stock, had observed the plain mandate of the Constitution, they would have had in the treasury of the bank the above sum, which the bank would have had as part of its working capital, or else they would have had the stock itself, and the public could not have been misled as to the actual available capital of the bank. The above sum was almost a third of the purported capital of the bank, which, the bank did not have the use of. But notwithstanding this fact, the president and cashier, or secretary, of the bank, in their first annual statement, reported a paid-up capital of over $40,000, and in the three succeeding statements reported a paid-up capital stock of $50,000.

(2) While it is primarily the duty of the president and secretary of corporations to make the annual statement required by section 848 of Kirby's Digest, yet the directors, who have control over the corporation, are negligent if they knowingly permit the above officers to make a false report. We have held that the certificate of incorporation showing the amount of capital stock, etc. (Section 845 of Kirby's Digest) required to be filed by the president and directors, must be true and correct. *O'Neil* v. *Eagle Generator Co.*, 92 Ark. 416.

The same principle governs with reference to the annual report required to be filed by the president and secretary, showing the condition of the affairs of the corporation. They must be true and correct reports.

(3) While a failure to comply with this statute renders the officer whose special duty it is primarily liable to creditors, nevertheless, these, as well as all the other duties required of the officers and agents of these corporations, must come under the general supervision of their governing boards. These boards must exercise at least proper diligence to see that the officers and agents do their duty for the protection of creditors, stockholders and the public generally who have or may

wish to have business transactions with such corporation. The directors of a bank can not expressly authorize the conduct or knowingly permit or acquiesce in the conduct of its officers in making alluring, but at the same time illusory, reports of the bank's financial condition, calculated to mislead the public and to cause a loss to those interested in the bank's financial affairs without being themselves also liable for the loss occasioned by such negligence. Such is the doctrine of our own court, under our statute, and the doctrine of the authorities generally upon similar statutes concerning the liability of directors to creditors. *Fletcher* v. *Eagle,* 74 Ark. 588; *O'Neil* v. *Eagle Generator Co., supra; Bailey* v. *O'Neal,* 92 Ark. 327; *Wait* v. *McKee,* 95 Ark. 124. See also 7 R. C. L., p. 514, section 499. *Jones National Bank* v. *Yates,* 240 U. S. 541.

The above doctrine for the protection of creditors under our statute was also extended, in the case of *Bank of Des Arc* v. *Moody,* 110 Ark. 40, 41, to cover the liability of directors to stockholders. In the latter case it was alleged that the directors "negligently and purposely failed and neglected to give attention to, or take any control in, the management of said bank and its affairs, and allowed the cashier to carelessly dissipate the assets in making bad loans." The court said: "This charge is sustained by the evidence," and that "under the doctrine laid down by this court in the case of *Bailey* v. *O'Neal,* 92 Ark. 327, this rendered the directors liable not only to the creditors who were defeated in the enforcement of their rights against the bank, but also as to the stockholders whose stock was rendered worthless on account of the losses sustained by the bank."

*Bailey* v. *O'Neal, supra,* was a suit by creditors against directors, and the liability was there determined and fixed with reference to statutes creating it in favor of creditors of corporations against directors, and it was there held that under the statutes the directors were liable for intentional acts of negligence. The case of

*Bank of Des Arc* v. *Moody, supra,* was a suit by stockholders against directors. While the case was correctly decided upon the undisputed evidence, it was not accurate, as we shall see, to ground the decision upon the doctrine announced in *Bailey* v. *O'Neal, supra.*

It is contended by counsel for the appellants that if the directors were guilty of no fraud or gross negligence themselves that they would not be liable as directors for any fraudulent conduct, or any negligent acts of the president and cashier of the bank.

We are thus brought to a consideration of the question of what is the duty of directors to stockholders. We have no statute expressly defining such duties and prescribing liability for failure to discharge such duties, as in case of creditors. The statute, however, in broad terms, as we have seen, places the "stock, property, affairs and business of such corporations" under the care of their board of directors. to be managed by them.

The statute creates a relation and confers a power which necessarily carry with them corresponding duties and liabilities, independent of any statute specifically defining or limiting those duties and liabilities; and, in the absence of any statute, they must be ascertained and controlled by common law rules applicable generally to such relations and powers.

In *Bosworth* v. *Allen,* 168 N. Y. 157, 164, Mr. Justice Vann, speaking of directors, said: "Clothed with the power of controlling the property and managing the affairs of the corporation, without let or hindrance, as to third persons they were its agents, but as to the corporation, itself, equity holds them liable as trustees. * * * For all practical purposes they are trustees when called upon in equity to account for their official conduct." See also *Delano* v. *Case,* 2 Am. St. Rep. 81.

In *Briggs* v. *Spaulding,* 141 U. S. 132, 147, Chief Justice Fuller, speaking for the court, said: "Bank directors are often styled trustees, but not in any technical sense. The relation between the corporation and them is

rather that of principal and agent, certainly so far as creditors are concerned, between whom and the corporation the relation is that of contract and not of trust. But, undoubtedly, under circumstances, they may be treated as occupying the position of trustees to *cestui que trust.*"

We deem it unnecessary to attempt to define the precise relation of the board of directors to stockholders. As the directors are chosen by the stockholders, and under the law, are given the care of the "stock and property" and plenary power to manage the "affairs and business" of the corporation in which the stockholders have invested their money, their selection imports a very high degree of trust and confidence reposed in them by the stockholders. Therefore, the relation, with its powers and duties, at least in equity, perhaps approaches more nearly the relation of that of the active trustee to his *cestui que trust* than that of the ordinary relation of agent to his principal. But, be that as it may, there is no uncertainty, according to the great weight of authority, as to the duty of the director to stockholders and the resultant liability for a failure to discharge that duty.

In *Briggs* v. *Spaulding, supra,* the court had under consideration the Revised Statutes of the United States empowering a national banking association "to exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking," etc. Chief Justice Fuller, speaking for the court, in the course of his opinion, said: "The corporation had power to carry on its business through its officers. And although no formal resolution authorized the president to transact the business, yet in view of the practice of fourteen years or more, we think it must be held that he was duly authorized to do so. It does not follow that the executive officers should have been left to control the business of the bank absolutely and without supervision, or that the statute furnishes a justification for the pursuit of that course."

And he concludes his exhaustive opinion as follows: "Without reviewing the various decisions on the subject, we hold that directors must exercise ordinary care and prudence in the administration of the affairs of a bank, and that this includes something more than officiating as figureheads. They are entitled under the law to commit the banking business, as defined, to their duly authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention."

Note that this language was based on a statute which empowered banking associations to exercise, by their "boards of directors or duly authorized officers or agents," all powers necessary to carry on the business of banking. Even under this statute, which vested the power in the "board of directors, *or duly authorized officers or agents,*" the court said that the directors were not absolved from the duty of reasonable supervision over them. But our statute contains no alternative provision. It vests the exclusive power in the directors to manage the affairs and business of corporations. The opinion, for the most part, is an admirable statement of the law, but we can not subscribe to the language of the concluding paragraph above quoted which seems to imply that directors may be shielded from liability because of want of knowledge of wrongdoing on the part of their duly authorized officers, unless their ignorance of such wrongdoing is the result of gross inattention. We approve, rather, of the doctrine announced by Mr. Justice Harlan, in that case, speaking for himself and the other dissenting judges, as follows:

(4) " 'Directors can not in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its officers. They

have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known, in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business.' *Martin* v. *Webb,* 110 U. S. 7, 15. A rule no less stringent should be applied as between a banking association and directors representing the interests of stockholders and depositors. Subscriptions to the stock of banking associations, and deposits with it, are made in reliance upon the statutory requirement, which can not be dispensed with, that its affairs are to be managed and administered by a board of directors, acting under oath and with such diligence as the situation requires."

Again, he says: "When one deposits money in a savings bank, or takes stock in a corporation, thus divesting himself of the immediate control of his property, he expects and has the right to expect, that the trustees or directors, who are chosen to take his place in the management and control of his property, will exercise ordinary care and prudence in the trust committed to them —the same degree of care and prudence that men prompted by self-interest generally exercise in their own affairs. When one voluntarily takes the position of trustee or director of a corporation, good faith, exact justice, and public policy unite in requiring of him such degree of care and prudence."

In addition to the authorities cited by Mr. Justice Harlan see the following well considered cases cited in the briefs of Daniel Hon and of H. C. Mechem for the appellees: *Warren* v. *Robinson,* 19 Utah 289, 75 Am. St. Rep. 734; *Union National Bank* v. *Hill,* 148 Mo. 380, 71 Am. St. Rep. 615; *Coddington* v. *Canaday* (Ind.), 61 N. E. 567; *Solomon et al.* v. *Bates et al.,* (N. C.) 24 S. E.

478; See also 21 A. & E. Enc. Law 875-6; 7 R. C. L., p. 473, § 454 *et seq.* 459, inclusive.

The duties of directors are perhaps nowhere better stated than in a syllabus, showing the holding of the court, in *Wallace* v. *Lincoln Savings Bank,* 89 Tenn. 631, as follows: "Bank directors are held to the exercise of only ordinary care and diligence in the discharge of their duties. They are not required to give their whole time and attention to the performance of these duties, but only so much as, under the special circumstances of each particular case, may be demanded for the reasonable protection of the interests committed to their care. They are not insurers of the fidelity or capacity of the cashier or other agents to whom the business and assets of the bank may be intrusted, but are required to exercise due care in their selection and proper supervision over their action."

Even if no higher degree of care were exacted of directors toward stockholders than that required of them toward creditors, under the statute, that is, that they should be guilty of no intentional acts of negligence, or, no connected acts from which intentional or gross negligence could be inferred, as held by us in *Bailey* v. *O'Neal, supra,* and other cases, still the appellants, under the facts of this record, could not escape liability. But, in view of the far-reaching importance of the subject, and in order that there may be no misapprehension on the part of directors as to what their duties are, we have set down above the correct standard of duty for them in order that the issue of liability or nonliability in any given case may be measured thereby. As to whether or not the directors are negligent must depend upon the peculiar facts and circumstances of each particular case when judged by the above rules.

(5) The facts of the case in hand upon which the liability of the appellants is predicated are fully set forth in the statement, and they speak for themselves. To briefly summarize them, they show that the bank be-

gan business on January 2, 1911, under rather favorable auspices, having a paid-up capital of some $36,000 and having the confidence of the public to such a high degree that during the first year, according to its annual report, the deposits had reached $103,609.20, and it had cash and sight exchange to the amount of over $60,000. But the directors, instead of adding to its working capital by selling its stock for cash, in violation of the Constitution, sold the stock on a credit and took notes for the same to the amount of some $14,000, which, at the time of the failure of the bank, had not been paid. About one-fourth of this amount was for stock issued to two of the directors, who were insolvent at the time it was issued. Notes for stock were taken from these and other parties without any inquiry or ascertainment on the part of the directors as to their solvency, and without any security, and they took no steps to enforce the collection of the notes other than to merely direct their officers to try to collect them. Through worthless loans and overdrafts and heavy expenses, the assets of the bank were dissipated and no profits made the first year. On the contrary, there was an actual loss; but in order to boost the business of the bank and lead the public to believe that it was doing a prosperous business, the officers purposely made the first financial statement show that there was a paid-up capital of more than $40,000, and that there was a surplus on hand, showing a profit in the first year's business. The secretary juggled the figures so as to make the expenses appear some $500 less than they actually were, and that the furniture and fixtures were worth about $2,500 more than their actual value.

These false statements as to the paid-up capital went into every financial statement that was filed after the first year. Now, the directors knew, of course, that there was not a paid-up capital of $50,000, for they issued stock and took notes for same, which they knew had not been paid. In the exercise of ordinary care they could have known, too, that the financial statements

were padded to show a false value on furniture and fixtures, and that this was done to mislead the public.

The transactions involved in the loans negotiated by Halstead, by which Halstead, a pawnbroker, loaned small amounts to three or four hundred different people, taking their notes payable to German, and discounting these notes to the bank with the understanding that the bank was to have one-half of the amount that Halstead had charged for the loans, virtually put the bank in partnership with Halstead in the pawnbrokerage business. This arrangement between the cashier and Halstead and German thus enabled Halstead and German to exploit the necessities of the poor by unconscionable contracts with them, which the testimony of Dowd showed to be loans at exorbitant rates of interest, above ten per cent. per annum. These notes, therefore, were usurious and void. While the cashier testified that the directors knew "that we were making these loans," and that they held a meeting of the directors when about $6,000 of that paper was on hand, and that no criticism was made of any of them, the testimony of other directors shows that these transactions had been running on for several months and had reached the sum of about $6,000 before Pyle's attention was called to their questionable character. However, after that he was permitted to continue them until they had reached the sum of $13,509.00. This was not only unusual, but a disreputable piece of business for any bank to be engaged in. The numerous borrowers who were fleeced by the methods of these pawnbrokers through money furnished by the bank would naturally cause such methods to become widely known throughout the community, and nothing could have been more potential to the destruction of the confidence of the public in the integrity of the institution and the efficiency of its officers and governing board. Morton testified that "the $11,000 Halstead loan was one of the contributing causes of the failure;" that, "the day and night banks throughout the country had come into dis-

credit; a good many of the officers of these banks were under indictment, and a good many of the banks had gone to the wall; that created a fever of distrust all over the country, and we were trying to obviate that by changing the name."

The testimony indicates that it was not the name but the conduct of their officers that was bringing these banks to grief, and therefore the directors of the Day and Night Bank at Fort Smith should have given their attention not merely to the change of name, but also especially to a change of the methods of business pursued by their cashier Pyle. The testimony of experienced bankers, Morton and Dowd, tended strongly to prove that one of the principal factors in the wreckage of this institution was the reckless conduct of its cashier in making worthless loans.

While the proof tends to show that the directors exercised all the care that ordinary prudence required of them in the selection of Pyle as cashier, yet their duty, as shown by the above authorities, did not end there. They could not turn over to him, without supervision and restraint, the important matter of making loans for the bank, upon which its financial success almost entirely depended. Doubtless Pyle, the cashier, was encouraged in his reckless handling of the bank's funds in making bad loans and allowing worthless overdrafts by knowledge of the fact that the directors were giving practically no attention to the matter of loans, as was demonstrated in his own case, for he, although confessedly insolvent, was permitted to borrow $2,800 from the bank without question and without security.

But we need not pursue the subject further. The above are the most important facts which show that the officers of the bank were grossly negligent in making worthless loans and allowing worthless overdrafts, and which conduct the directors, in the exercise of ordinary care in the management of the business and affairs of the bank, knew, or could have known, and should have cor-

rected. This applies to the directors jointly and severally as members of the board. Some of the directors individually stand on a different footing from the others as to certain stockholders, but it does not affect the question of their liability generally.

The decree in favor of I. N. Johnson against J. F. Mayes individually and separately for the sum of $250, with interest, the amount of the 50 per cent. assessment, was grounded on the false and fraudulent representations made directly by Mayes to Johnson. This decree is not against the clear preponderance of the evidence and is affirmed.

(6)    Director Fulbright, in addition to the common defenses made by the other directors, urges in his own separate defense that he was not a director during the period of the alleged derelictions which the court found resulted in the financial ruin of the bank and the loss to the appellees. This was a mixed question of law and fact. If Fulbright was not elected, or if he was elected, but not notified, and if he did not accept the election and did not participate in the meetings of the board during the years 1912 and 1913, then he was not liable. *United Growers Co.* v. *Eisner*, 22 N. Y. App. Div., pp. 1-6; *Whittaker* v. *Amwell National Bank*, 29 Atl. 203. Fulbright testified that he was elected for the year 1911, and that a new board was elected at the meeting of the stockholders held in January, 1912, and that if he was re-elected at that meeting he was never notified of such election, and that he did not accept such election and was therefore not bound by the action of the stockholders if they did re-elect him. That he did not act as director during the years 1912 and 1913. But the decided preponderance of the evidence tends to show that at the expiration of Fulbright's first term he was re-elected, and that he participated as a director in meetings of the board during the years 1912 and 1913, when the delinquencies are alleged to have occurred. The testimony of Morton is positive to the effect that Fulbright did not

attend the board meetings during this period, which would tend to show that he was not a director and had not accepted the election to that position. But the testimony of Mayes, Colonel Peel and C. L. Pyle was to the effect that Fulbright was elected as director and continued to participate in the management of the affairs of the bank from the time he was first elected, and that he was re-elected and was a director during the whole life of the bank. Mayes, the president, testified that he did not attend the meetings of the board as often as some of the others, but that he conferred with him as such director, and the testimony of Colonel Peel, and also of Pyle, shows that he was present at certain board meetings and participated as director during the years 1912 and 1913. Such being the case, as shown by the preponderance of the evidence, the fact that he did not attend the meetings as often as other members, in the absence of some good cause shown, would only tend to prove that he was even more remiss and negligent in the discharge of his duties in this particular than were the other members who did attend.

The record shows that A. N. Cole and J. H. Frost, against whom judgments were entered for the amount of their notes for stock, prayed and were granted an appeal, but no brief has been filed by them, and therefore we presume that they have abandoned their appeal, and the judgment against them must be affirmed for failure to comply with Rule 8 of this court.

As to the cross-appeal of appellees Lora Goolsby, Z. L. Reagan, Mary B. Reagan and L. V. Parker, it appears that February 9, 1914, the stockholders had become aware of the fact that there had been a considerable depreciation in the value of the notes and other assets of the bank, and being desirous of making such depreciation good and restoring the full value of all the stock, and to give the bank a full paid-up capital based upon assets of unquestioned value, a long list of the stock-

holders signed an agreement to levy an assessment of 50 per cent. on their stock.

On July 1, 1914, there was a call meeting of the stockholders of the bank at which an assessment of 50 per cent. was voted and levied by the stockholders for the continuance of the bank. Judge Hon, who represented Mrs. Goolsby, attended the meeting of the stockholders and suggested that they make the assessment 25 per cent. instead of 50 per cent., and his testimony shows that the directors talked about the cashier "having put the bank in the hole," and that he favored the assessment rather than to lose what he had put in it for Mrs. Goolsby. He testified that the Bank Commissioner had ordered an assessment of 50 per cent. He asked Mayes, the president of the bank, as to whether the others were going to pay the assessment and Mayes replied that "he thought they were pretty generally." Judge Hon then paid the assessment with the understanding that the others had paid it, and advised Mrs. Goolsby that others were paying it, "and if they paid the bank was going to go." The others paid their assessment under practically the same circumstances.

The court found that these assessments were paid on representations made by the officers of the bank to the effect that in their opinion the payment of such assessment would place the bank in a position to carry on the business successfully and give it operating capital until outstanding debts could be collected; and, upon the representations that other stockholders were paying these assesments, Mrs. Goolsby and the other cross-appellants paid the amounts assessed against them.

The court held, upon these findings, that the payment of the assessments and the giving of the notes for unpaid assessments was voluntary, and entered a decree refusing a judgment for the amount of these assessments, except as to Johnson, whose judgment against Mayes for the assessment was based upon false representations, which we have already disposed of. The

court dismissed the complaints of Mrs. Lora Goolsby and the other interveners mentioned, except Johnson, for these assessments, and also entered a decree canceling the outstanding notes that were given for such assessments as being without consideration, past due, and nonnegotiable.

(7) This holding of the court, based upon these findings, was correct. The stockholders, or those who spoke for them in the stockholders' meeting, had then become aware of the collapsed condition of the bank and the causes thereof, and these payments were dictated by the efforts of the stockholders themselves to resuscitate and continue its ebbing life. The bank, notwithstanding these heroic efforts, nevertheless became defunct. The payment of such assessments proved to be a mistake on the part of the stockholders making such payments, but it was a mistake made by the stockholders themselves. The stockholders had their choice to pay the assessment or to close the bank. They chose the former, but it was their choice and not that of the directors. The payment was voluntary and the directors could not be held responsible for it.

None of the delinquent stockholders against whom the court rendered judgments for the unpaid balance of their stock subscriptions in favor of the bank have appealed.

The decree in favor of J. H. Frost, E. B. Russum, A. N. Cole, R. O. Herbert, Alta Blaylock, J. O. Gunter, C. L. Pyle, W. H. Cole, R. T. Powell, Lawrence Wright, R. P. Reynolds, E. D. Vann and J. O. Johnson against the directors were upon the contingency or condition that each of these parties should pay the decrees rendered against them respectively in favor of the bank. These decrees were not only anomalous, but they were without authority of law and void.

That a judgment *in presenti* can not be rendered and grounded upon a future condition or contingency, see *Battell & Collins* v. *Lowery et al.,* 46 Iowa 49. In the

course of the opinion in that case the court said: ''If there was a present judgment, it was at most a judgment that there should be a judgment. But we can not sanction such an anomalous proceeding.'' See, also, *Simmons* v. *Jones,* 24 S. E. 114, 118 N. C. 472; *Early* v. *Moore,* 4 Munford, 262. Moreover, these decrees were beyond the scope of the issues raised by the pleadings. The delinquents who were sued on notes for stock and for borrowed money were not asking for judgments over in their favor against the directors.

(8)  The court allowed interest on all the judgments in favor of the appellees from December 31, 1913, that being the date when it was first ascertained that the stock, on account of the negligence of the directors, had become worthless. This was correct. Appellees were entitled to interest, not from the dates on which they paid respectively for their stock, but from the date that the court found that the stock was rendered worthless. It is clearly within the discretion of the chancellor to allow or refuse to allow interest in cases analogous to this where an account is taken between the directors and the stockholders. Courts of chancery, in such cases, are governed by the particular facts in each case. *Turner* v. *Turner et al.,* 44 Ark. 25.

This record, which is embodied in nearly nine hundred pages of transcript, shows that the chancery court gave the case, which involved numerous parties, with varied interests, and in which there was a great volume of evidence presenting complicated issues of fact as well as law, a most painstaking and thorough consideration, and that it has reached, for the most part, the correct conclusion. The decrees in favor of the delinquent stockholders above named are reversed, set aside and held for naught. In all other respects the decree is affirmed.