## WHITE RIVER LEVEE DIST. v. McWILLIAMS DREDGING CO.

## McWILLIAMS DREDGING CO. v. WHITE RIVER LEVEE DIST.

### Nos. 8660, 8675.

Circuit Court of Appeals, Eighth Circuit.

April 16, 1930.

Ross Mathis, of Cotton Plant, Ark., and Charles T. Coleman and Walter G. Riddick, both of Little Rock, Ark., for White River Levee Dist.

Sam Costen and Wils Davis, both of Memphis, Tenn., for McWilliams Dredging Co.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and DAVIS, District Judge.

STONE, Circuit Judge.

This is an action by the dredging company against the district for damages arising from breach of a contract to construct a system of ditches for the district. Because of accounting features it was brought in equity. The cause was submitted to a master. The court sustained certain exceptions and overruled others to the report, and entered a decree in favor of the plaintiff for $27,381.45, with interest thereon from August 27, 1921. From such decree the defendant brings an appeal, claiming that there should be no recovery at all. The plaintiff brings a cross-appeal, claiming recovery in larger amount.

#### Main Appeal.

The main appeal raises the issues of the validity of the contract and of the right of the district to terminate such contract for nonperformance.

As to the right to terminate the contract, the evidence is sharply in conflict, but is sufficient to support the finding of the master, approved by the court, to the effect that there was not sufficient basis therefor. Where a finding is made by a master and approved by the trial court, this court will not reverse such action, unless it be made to appear very clearly that there was no substantial evidence upon which to base such result. There is no such showing here, and that point is resolved against the district.

The validity of the contract is attacked upon two grounds. It is claimed that each of these grounds is a necessary precedent condition to any authority on the part of the district to make such a contract. One of these claimed precedent conditions is that there was no plan adopted by the board for the doing of this work before the contract was let. The second alleged precedent condition is that there was no assessment of benefits covering the work before the contract was made.

#### Plan of Work.

The master found that no definite plan locating the proposed ditch or drain, with proper estimate of its cost, was ever adopted by the board, and that such plans were required by the act authorizing the improvement. The court found that plans in sufficient detail were prepared by the engineers of the district submitted to and used by the board of commissioners, and that these plans set out in sufficient detail the location and size of the ditches upon which to base the estimate cost and the nature of the work to be done, and that such plans were a sufficient compliance with respect to preparation and adoption of plans.

Early in 1919 the engineer of the district was working on a general drainage survey which was apparently completed shortly before December 10, 1919. Upon that date, a meeting of the board was held for the purpose of hearing and passing upon that matter, at which time "the plans and specifications as prepared were laid before the meeting and the report of Mr. Bailey was read by him to the board and landowners present." The only action taken was that "the said plans and report were ordered filed with the secretary." The minutes of a meeting held by the board on February 24, 1920, show that it was held for the purpose of receiving bids for this work "according to the plans and specifications of consulting engineer, C. B. Bailey, who was present at the meeting." At that meeting the bid of the appellee was submitted and accepted. From the above, two things appear clearly: First, that there was no formal adoption of a plan for this work; second, that some sort of plan and specifications had been filed with the board and were the bases of bids and of the contract for this work. As to just what those plans and specifications were, there is a conflict in the evidence which would have justified a finding either way as to the sufficiency of such plans. This evidence appears in the testimony of J. B. Wilson, C. B. Bailey, E. E. Mashburn, and E. L. Freeman. The testimony of Bailey is abundantly sufficient to establish that Mashburn (engineer of the district) made rather detailed plans showing the location, elevations, estimates of excavation, and other data, which were embodied in a report approved by Bailey, who acted as consulting

and critical engineer. In fact, Bailey was employed to check and criticize Mashburn's work in this regard and the plans represented the work of Mashburn with Bailey's action thereon. The court was amply justified in finding that these plans were sufficient *in character* to meet the requirement of the statute, leaving open only the question of law as to whether a formal adoption of the plans was required by the statute. The only statutory requirement in this regard is in connection with a reassessment. This is contained in Section 3 of the Act of 1920 (Acts Ark., Ex. Sess. 1920, No. 27, p. 263), and is as follows: "When said Board shall have formed its plans for the improvement, it shall cause the assessors of the district to make a re-assessment," etc. This required that the board should determine upon a plan for the improvement. The usual way of manifesting such a determination is by a formal action incorporated in the minutes of the board. However, where a plan has been submitted to and, by the board, ordered filed, with its secretary, and is so filed, and the board thereafter advertises for bids to do the work, as outlined by such plan, and makes a contract therefor, and the contractor proceeds with the work thereunder, we think the requirements of the above statute have been substantially met.

### Assessment.

This appellant urges that an assessment of benefits covering the improvement was a necessary prerequisite to the making of a valid contract for its construction. Counsel cite several decisions of the Supreme Court of Arkansas. There are expressions in such cases which lend some support to this position. In our judgment, however, those decisions are not applicable to the facts here. The facts regarding this matter are practically beyond dispute, and are as follows: In 1911 (Sp. Acts Ark. 1911, No. 97, p. 215) the Legislature passed a special act authorizing the formation of the White River levee district for the purpose of protecting lands from overflow of that river by a construction of levees. The district was formed and levees were constructed. Within such district was a portion of the Cache river, which is a tributary of the White river. It developed that lands along the Cache river required protection in addition to that afforded by the levees constructed along White river. It was conceived that this protection could be afforded by straightening the channel of the Cache river. With that object in view, a special act was passed in 1919 (Sp. Acts Ark. 1919, No. 178, p. 306), empowering the levee dis-

trict to straighten that river and for that purpose to issue bonds, not to exceed $150,000. Thereafter two difficulties developed in connection with that matter. The first was that the bonds so authorized could not be sold because the 1919 act made no specific provision for their payment from assessments upon the land in the district. The second appears to have arisen from the investigations of the engineers of the district in connection with a plan for such work. That investigation developed, in the opinion of the engineers, that a mere straightening of the channel of Cache river would not afford the desired relief, but that it would be necessary to construct a line of ditches across the bends of that river, and that such an undertaking was much larger than had been contemplated and more expensive. This investigation resulted in plans, etc., drawn up by the engineer (Mashburn) and approved by Bailey in a report made to the board. These plans and report are those referred to in the point above discussed. The necessity for further legislation was apparent, and this resulted in the act of 1920, which authorized "the Board of Directors of the White River Levee District * * * to straighten the channel of Cache River * * * and to construct such drains, ditches and levees * * * as will be necessary to protect the lands of the district from overflow from the waters of Cache River" and its tributaries. "To that end" the district was authorized to issue bonds in a sum not exceeding $400,000. The act also provided that such bonds should be secured by a lien on all lands, etc., in the district, and the board of directors are directed to "see to it that a tax is levied annually, and collected under the provisions of this bill, so long as it may be necessary to pay any bond issue or obligation contracted under its authority." There is also provision for the appointment of a receiver should the bonds or interest come in default. Section 3 of the act is as follows:

"Section 3. When said Board shall have formed its plans for the improvement, it shall cause the assessors of the district to make a re-assessment of the benefits which will accrue to the lands affected by the work of improvement herein contemplated, and said assessment of benefits shall be made, advertised and equalized in the manner provided in the act establishing said White River Levee District; but until said re-assessment is made, equalized and finally established, the owners of real property within said district shall continue to pay their taxes upon the existing assessment of benefits, as

the same are now levied, or as they may hereafter be levied by said Board."

Several things are necessary to be noted. One of these is that the Legislature recognized the existence of the levee district and contemplated that this improvement should be made by that district as being related to the lands in the district and to be paid for by the district as then formed. It did not contemplate the formation of a new district composed of only such lands as might be benefited by this particular improvement, nor did it contemplate that the same result should be reached indirectly by having this improvement paid for only by those lands in the district found to be directly benefited by it. The thought of the Legislature clearly was that this improvement was subsidiary to, related to, and additional to, that for which the district had been formed. At the same time the Legislature realized that particular benefits might flow from this improvement to certain lands in the district which would not be experienced by all. Also the Legislature properly recognized, what was indeed a fact, that the lands which would be benefited particularly by this improvement had received a lowered assessment in the district because they were subject to overflow or damage which this improvement was designed to do away with. Therefore the Legislature deemed proper a reassessment of the lands to be affected by this improvement. The Legislature had a practical situation to deal with. One feature of that situation was that this district had been in existence for some years with improvements constructed, obligations outstanding, and benefits assessed. It had to fit this later law into that situation. This it sought to do by providing for the reassessment of certain of the lands (those particularly affected by this new improvement), but at the same time recognizing and continuing existing assessments until the one authorized by this act had been made. The act is clear that this improvement was to be paid for by the entire district. Because of the above situation and requirements of the act, we think this reassessment was not a prerequisite either to the sale of the bonds authorized by this act or to the making of a contract and the doing of the work.

## Cross-Appeal.

This cross-appeal is based on the refusal of the trial court to allow all of the damages claimed. The claim in the petition is for two general items: "In preparing for and doing the construction" $141,890.03; and loss of future profits $68,177.00—a credit,

through payments and advances, of $58,-349.13 was conceded, leaving a balance of $151,717.90 (erroneously stated in the petition as $152,721.00) due. The first item was made up of "installation expense," $31,132.-13; "hull or boat expense," $32,873.38; and "construction expense," $77,884.52.

The master found the above installation, hull, and construction items in the above amounts and that $45,080.35 (which did not include $17,776.85 advanced by the district to pay for clearing right of way) had been paid by the district on the contract. Neither the master nor the court made any finding as to amount of future profits. The master deemed the contract invalid, so accorded no recovery. The court allowed the item of "hull or boat expense" (less value at time of cancellation of contract, of $10,000); rejected "installation" expenses as being duplicated by the "hull or boat" item; rejected the "construction" expense; allowed $4,508.-07 due for work actually performed at the time of such cancellation; and rejected all claim for future profits.

■Where a construction contract has been breached by refusal of the other party to further perform, the rule for damages to the contractor is set forth in United States v. Behan, 110 U. S. 338, 344, 4 S. Ct. 81, 83, 28 L. Ed. 168, as follows:

"If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely,—First, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract. The second item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires."

Applying the above rule to the facts of this case, our conclusions are as follows:

■ The claim for future profits is not allowed. The evidence falls short of "that clear and direct proof which the law requires" of a future profit or of the amount thereof. One side of the evidence is that this contract required excavation of 80,000 cubic yards each month and completion, in thirty months, of the estimated 2,400,000 cubic yards of excavation; that at the end of fifteen months only 290,841 cubic yards had been excavated; that the new and only dredge on the work could not possibly com-

plete the work in contract time; that the work, up to cancellation, had been at a loss. The other side of the evidence is that other dredges could have been put to work, and that the profit on the work to be done would have been at the various figures put by several witnesses. In the face of the undisputed condition at the time of cancellation, we are not justified in assessing substantial damages upon the bare estimates as to future happenings.

The other items are upon a different footing. They are claimed actual expenditures. Two of these ("installation expenses" and "hull or boat expenses") are related. "Installation Expense" account included "bringing in of the original dredge boat and the preparation, supplies and materials for the construction of the new hull." The "hull or boat expense" account "represents the cost of completing and equipping the new hull." The trial court thought these two items were duplications, and allowed the latter, less salvage value. The evidence is that, as soon as the contract was entered into, a dredge boat was started from Menfro, Mo., to the work site, four hundred miles away, and was "on the scene" in twenty days; that this boat was unfitted to do this work, and could not possibly do it in anything like the contract time limit; that the boat was fourteen years old, had been sold by the contractor, and, after a year, taken back (when the purchaser became bankrupt), and moved to this work; that, at the time this boat was sent, the contractor ordered "timber, iron and material for the construction of a new hull for this dredgeboat"; that the contractor knew a new hull would be necessary for "economical and continued operation"; that the old dredge "was so inefficient that we thought it necessary to build a new one, and, during the time of this construction work, we didn't do much excavation"; that this work "required a very strong hull"; that the old dredge arrived in May, 1920, and the new hull was not ready until February or March, 1921. It is obvious that the contractor placed on the work an old, inefficient machine which it knew could not do the work and intended to replace it later with a new efficient one which was to be built. The real reason for this unusual action was to secure and hold the contract—as said by one witness, "It was decided, in view of the quickness with which these people wanted the work started, to move the dredge in, and immediately proceed to build a new hull for it." Not only was this boat entirely inadequate, and known by the contractor to be so, but it did not at all comply with the contract requirement. The contract required:

"The contractor shall install, within forty days after having been notified that the bonds issued for this proposed work have been sold to a responsible firm of bond buyers, one three-yard dredgeboat having a boom of not less than seventy-five feet in length, this equipment to be installed at the head of the lower ditch in section nine, township 4 north, range three west, and shall then proceed with the excavation downstream at the rate of not less than 80,000 cubic yards per month."

The contractor knew this boat was no compliance with the contract, and could not approach doing the work required thereby.

While the above-quoted rule of law allows recovery for "what he has already expended toward performance," such expenditures must be "fairly and in good faith" laid out, and must not be "extravagant, and unnecessary for the purpose of carrying out the contract." United States v. Behan, 110 U. S. 338, 345, 346, 4 S. Ct. 81, 83, 28 L. Ed. 168. Certainly, when the contractor understood the impatience of the district to begin this work, and, of course, carry it through, it cannot, in violation of the express terms of the contract, knowingly place an entirely inefficient plant on the work for the purpose of holding the contract, and then claim such expense as a damage. We think the allowance of this "installation expense" of $31,-132.13 was properly denied.

The second and related item is "hull or boat expense." This was expense incurred in building a new hull for the dredge boat. The material was ordered and sent to "Cotton Plant, Arkansas," where the new boat was constructed. This seems to have been within or near the levee district. The court allowed this item, reduced by $10,000. Apparently the theory of the court was that this was an installation expense. We are unable to accept this view. As said above, the contractor was obligated (in the contract) to furnish, for the work, a dredge of a certain described character which could excavate a given minimum of yardage monthly. The old boat was the one sent to begin the work, and was the only one which ever did any excavating. The new boat was intended as a replacement and not as an installation. However, had this boat been brought to the work, the contractor might have been entitled to the expenditures for getting it there and for taking it away. The difficulty is that there is no evidence as to such expense of taking it away, and it was

built on the ground. To require the district to pay the cost of making a new boat is another matter. This is not a case of an expenditure purely and solely for this work. The plaintiff was extensively engaged in excavation work of this general character, and, while this work was the immediate occasion for building this new boat, yet it does not appear that this boat will not be entirely useful to plaintiff in its work elsewhere. It was a replacement of an old hull by one "very strong, the construction of which is expensive," built "especially to serve the three yard machines." While one witness testified that the market for such a hull was only to a contractor having the "same work to do" or for a heavy freight barge, yet the same witness said plaintiff "had in mind another and larger machine which we also proposed to move on the work from Marked Tree, Arkansas." In fact, the evidence not only fails to show that this new boat was fitted only for the work under this contract and would otherwise have only a salvage value to plaintiff, but it convinces that the boat would be a useful instrument in plaintiff's business. Also it is evident that the only effect, if any, which this work had on the building of this new hull was to make it more expensive because of the stronger construction. The evidence is bare of any showing as to what amount, if any, was expended over and above what would have been paid out to replace the old boat with a hull of ordinary strength. We think there can be no recovery, under the evidence, for this item.

The next item is "Construction Expense." This included "all the expense of operations including operating the dredge after it arrived on the work, providing all necessary supplies and labor and cost of everything associated with moving dirt." The master found the amount so expended to be $77,884.52, and we accept this finding without particular examination of the numerous items making up this total. The court rejected this item. We think this was error. So far as the evidence shows, this expenditure was in direct prosecution of the work under the contract. Against the above sum are two conceded credits: Payments made by the district to the contractor, for excavation, $40,572.28, and for clearing right of way, $17,776.85, a total of $58,349.13. The balance due upon this item is $19,535.39.

To this should be added several other items of loss shown by the evidence. The first of these is an unpaid indebtedness of $4,508.07 due from the district for work done since the last work estimate and up to the time work was stopped. The master found this item to be included in the $77,884.52 ("Construction Expense"). An examination of the items in that account does not discover this one. Probably what the master meant was that the expense for doing the work was included therein. But this item includes the profit, and was an earned and due item. Two other items are for coal and wood which had been placed along the right of way to be used as the work progressed, but which were not so used and could not be disposed of. The coal was 530 tons at $9 per ton, $4,770, and the wood was 350 cords at $4 per cord, $1,400, a total of $6,170.

The amount for which recovery should be had is made up of the balance of expenditures ($19,535.39), the work done since the last estimate and payment ($4,508.07), and the coal and wood loss ($6,170), making a total of $30,213.46.

Of the above sum, only the amount for work unpaid for ($4,508.07) was liquidated and known at the time the district stopped the work on August 20, 1921. On this amount, interest is allowed from that date at the rate of 6 per centum. As to the remainder ($25,705.39), interest at the same rate will begin from the date when the order upon this opinion is filed in this court. No costs will be allowed either party in this court. Costs in the trial court are assessed against the district.

The case is remanded, with instructions to enter a decree for $30,213.46 and interest and costs as above set forth.