BLAIR et al. v. UNITED STATES, for Use
and Benefit of GREGORY–HOGAN et al.
UNITED STATES, for Use and Benefit of
GREGORY–HOGAN et al. v. BLAIR
et al.

Nos. 12871, 12875.

Circuit Court of Appeals, Eighth Circuit.

Feb. 5, 1945.

As Modified Feb. 23, 1945.

Rehearing Granted March 13, 1945.

JOHNSEN, Circuit Judge, dissenting in part.

Henry Donham, of Little Rock, Ark. (Martin K. Fulk and Pat Mchaffy, both of Little Rock, Ark., on the brief), for United States of America, for use and Benefit of Gregory-Hogan, composed of Ben M. Hogan et al.

J. W. Barron, of Little Rock, Ark. (Ernest P. Rogers, of Atlanta, Ga., on the

brief), for A. Farnell Blair and United States Guarantee Company.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

GARDNER, Circuit Judge.

This was an action brought by Gregory-Hogan, a co-partnership, against A. Farnell Blair, to recover $140,255.37, alleged to be due for materials furnished, work performed and for damages sustained in the performance of certain contracts between Gregory-Hogan and A. Farnell Blair for paving and surfacing certain roads and parking places in an armored division camp constructed near the City of Fort Smith, Arkansas. Blair entered into a contract with the United States for the construction of the camp and then entered into three so-called sub-contracts with Gregory-Hogan. The United States Guarantee Company executed a performance bond for Blair and for that reason was joined as defendant.

The action was brought in the name of the United States for the use and benefit of Gregory-Hogan, under the provisions of the Miller Act, Title 40 U.S.C.A. §§ 270a and 270b. The claims for which recovery was sought were set out in paragraphs 5 to 12 of the complaint. However, claims alleged in paragraphs 7 and 8 of the complaint were settled before the entry of judgment and the claims affected by the judgment are those alleged in paragraphs 5, 6, 9, 10, 11 and 12 of the complaint. Sketchily described they are as follows: Paragraph 5, for an alleged balance due for materials furnished and labor performed under the original contracts, in the nature of an action for an accounting, in the sum of $59,494.22; Paragraph 6, for an alleged balance due for overtime under supplemental contract referred to in the record as "Speed-up Agreement," in the amount of $15,667.58; Paragraph 9, for damages on account of delay in furnishing sub-grade, in the amount of $22,652.50; Paragraph 10, for rental of additional equipment necessitated by delay in providing sub-grade and on account of "Speed-up Agreement," in the amount of $5,796.75; Paragraph 11, for alleged damages for breach of the so-called asphalt contract, in the amount of $30,000; Paragraph 12, for costs of overhaul of asphalt on account of "Speed-up Agreement" and breach of the asphalt contract, in the amount of $2,570.75.

The case was tried to the court without a jury, resulting in findings in favor of plaintiffs on paragraphs 5, 6, 10 and 11 of the complaint, and in favor of defendants on paragraphs 9 and 12 of the complaint. The court assessed the entire damages at $106,378.97, with interest from September 3, 1942 at 6 per cent per annum. At the beginning of the trial on October 11, 1943, counsel for defendants asked leave to amend their answer so as to plead as an offset to the admitted balance due, a claim for liquidated damages assessed by the government against plaintiffs' work under the subcontracts. The application was denied. Both parties have appealed. Subsequent to the trial, and under an agreement that the payment should be credited as a partial payment on the judgment without prejudice to the rights of either party on appeal, defendants paid the sum of $34,843.96. They have therefore paid the balance due on the account as found by the trial court, with the exception of two items which will hereafter be considered.

Seeking reversal, defendants contend: (1) A paving deduction of $345.58 was erroneously denied by the court; (2) the court erred in refusing to permit the amendment of defendants' answer so as to plead an offset of liquidated damages; (3) there is no basis for recovery under the "Speed-up Agreement"; (4) there is no liability for reduction of the amount of asphalt required; (5) interest was improperly allowed on the unliquidated damages.

In paragraph 5 of their complaint, plaintiffs claimed to have earned under the sub-contracts, $872,146.07, and that they had been paid $812,651.85, leaving a balance of $59,494.22. Embodied in this amount was a claim for $9,709.94 for expense in opening an additional gravel pit in order to expedite the work. This item was contested by defendants. They also claimed to be entitled to a credit on the account for items aggregating $20,708.31, of which $10,000, in round numbers, represented liquidated damages collected from Blair by the government on plaintiffs' work. The balance represented back charges and paving rejections. On this paragraph 5 the court found in favor of the plaintiffs in the amount of $45,204.72, and of this

amount, as above noted, defendants have since the entry of judgment paid $34,843.96, so that the amount in controversy recovered under paragraph 5 of this complaint, is $10,360.76.

■ The area engineer made a deduction of $345.58 against prime contractor Blair for the cost of replacing some pavement. As to this item the court found that the defect in the paving was due to a failure of a sub-grade which had been constructed by another contractor and hence was not chargeable to plaintiffs. This finding is sustained by ample evidence. Manifestly, plaintiffs could not be held liable for a failure of the paving caused by the faulty work of another contractor. Expressions in their contract in the nature of guaranties of their work must be limited to defects for which they are responsible.

The other substantial item arising under paragraph 5 of the complaint was that involving a claim for liquidated damages. At the beginning of the trial on October 11, 1943, counsel for defendants asked leave to amend their answer so as to plead an offset of $10,015.18 for liquidated damages assessed by the government against plaintiffs' work under the sub-contract. Counsel for defendants had notified counsel for plaintiffs on October 5, 1943, that such an amendment would be tendered and written notice was given on October 6th. Counsel for plaintiffs, however, objected to the allowance of the amendment on the ground of surprise. Rule 15(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides for amendments as a matter of course at any time before a responsive pleading is served, or if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, one may so amend as of course within twenty days after it is served. Other amendments to pleadings may be allowed only by leave of court or by written consent of the adverse party. Each of the three contracts involved contains the following:

"Liquidated damages for delay in completion applicable to the Contractor are also applicable to the Sub-Contractor in the event of delays caused by the Sub-Contractor."

■ Where the opposing party will not be prejudiced, amendments to pleadings should be liberally allowed. We so held even before the adoption of the Rules of Civil Procedure. Schulenberg v. Norton, 8 Cir., 49 F.2d 578. Before amendment defendants' answer did not suggest a liability on the part of plaintiffs for liquidated damages on account of delay. Such an allegation would undoubtedly raise new questions, both of law and fact. The action was commenced March 3, 1943. Answer was filed July 15, 1943, three months before the trial began. In these circumstances the trial court might well have concluded that it would be unfair to permit the amendment and force plaintiffs to trial on the new issue thus tendered. The application was addressed to the judicial discretion of the court and in the absence of an abuse of such discretion the ruling will not be reversed on appeal. Schulenberg v. Norton, supra; Wittmayer v. United States, 9 Cir., 118 F.2d 808. There was here no abuse of discretion. The question of liquidated damages was therefore not before the trial court, nor may we here consider it.

■ The court permitted plaintiffs to recover under the so-called "Speed-up Agreement," and this is here urged as error. Completion date under the contract between Blair and the government was March 24, 1942. Excessive rains fell in October, 1941, to such an extent as to cause the government to extend the completion date to April 11, 1942. On February 7, 1942, Blair agreed to complete the work under his contract by March 26, 1942, with the exception of the asphalt work. A written supplemental contract was accordingly entered into between Blair and the government on February 7, 1942. Article II of this supplemental agreement is as follows:

"In consideration of the advanced completion date as provided in Article I, hereof, the Government will, in addition to the original contract price, reimburse the contractor for additional costs incurred on or after January 23, 1942, resulting from the reduction in time for completion of work under the contract. Such reimbursements to the contractor will be made on the basis of expenditures approved by the Contracting Officer."

On February 27, 1942, Blair sent plaintiffs a copy of the supplemental agreement, and his letter of transmittal, among other things, said:

"I am also attaching hereto an exact copy of 'Supplemental Agreement' which myself and Bonding Company have been requested to execute, and which in effect, withdraws the 17 day extension of time, and in consideration of that, commits the Government to pay extra compensation for additional costs due to speeding up completion date to March 26th. All sub-contractors on this project have been fully aware for the past several weeks that the two aforementioned Change Orders were in preparation, and have been instructed verbally that additional compensation would be allowed by the Government to speed up completion. All Sub-contractors have also been requested to turn into this office daily for official submission, exact costs incurred from day to day, over and above what the costs would have been on the basis of completing on the revised date if the time extension was taken into consideration. * * *

"It is requested that all Sub-contractors examine the attached documents carefully and advise this office immediately any comments you care to make. It is my intention to sign this Supplemental Agreement, and I am going on record at this time that you are hereby being committed to a completion date of March 26th, with additional compensation as approved by the Government being granted you where applicable, in accordance with Article II of attached Supplemental Agreement."

There is no evidence of any verbal contract by which Blair agreed to pay plaintiffs for extra expense incurred as a result of the "Speed-up Agreement." The above quoted letter discloses not a promise by Blair to pay, but that additional compensation as approved by the government would be granted where applicable. This implied a promise that Blair would turn over funds if and when realized by allowance and payment by the government. As such payment has not been received by him and no claim is made that he has not diligently attempted to make collection, and it affirmatively appears that he has done so, defendant should not be held liable contrary to the terms of his agreement. Thomson v. Leak, 135 Cal.App. 534, 27 P.2d 795; Wheat v. Platte City Ben. Assessment Special Road Dist., 227 Mo.App. 869, 59 S.W.2d 88; Cowan v. Browne, 63 Mont. 82, 206 P. 432. We conclude that plaintiffs were not entitled to recover on account of the speed-up agreement though they may be entitled to such recovery dependent upon whether or not defendant Blair received additional compensation from the government on account of the adjustment in the date of the completion of the work under his contract.

The contract between plaintiffs and defendant Blair relating to the placing of asphalt surfacing on roads and parking areas in the camp provides, among other things, as follows:

"The Sub-contractor will furnish all materials, including all necessary scaffolding, and fully construct, perform and in every respect complete all the items listed under Item 3—Priority No. 2: Items 3-12 and 3-13; and the following items listed under Item 13—Priority No. 2: Items 13-9 and 13-10 as required in connection with my contract for construction and completion of the Armored Division Camp, Fort Smith, (Barling) Arkansas, for the above named structure, according to the plans and specifications (details thereof to be furnished as needed) of the War Department Architect, and to the full satisfaction of said Architect. * * *

"No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing before the work is done or the changes made; in which writing shall be specified in detail the extra work or changes desired, the price to be paid or the amount to be deducted, should said change decrease the amount to be paid hereunder. (Article 7) * * *

"It is agreed and understood that the lump sum price contained in Article Fourteen of this Contract is the lump sum amount due Sub-Contractor based on the quantities in the Bid Form and the Unit prices as follows: 1½" Thick Asphalt Concrete Surfacing @ .73¢ per sq. yd. 2" Thick Asphalt Concrete Surfacing @ .89¢ per sq. yd.

"It is agreed and understood that the Sub-Contractor agrees to accept additions and deductions to his Contract at the above given Unit Prices. * * *

"If the quantities over-run the estimated quantities we will give you .05¢ per Sq. Yd. reduction on all additional hot-mixed asphalt work."

Article 14 provides:

" * * * In Consideration Whereof, the said Contractor agrees that he will pay

to the said Sub-Contractor, in monthly payments, the sum of Four Hundred Sixty-one Thousand, Nine Hundred Sixty-four Dollars ($461,964.00) for said materials and work, said amount to be paid as follows, etc."

Mr. Hogan, one of plaintiffs, testified that before the bid was made, he had had the specifications and conditions, and recalled a condition therein as follows:

"Adjustments of the contract amount of each lump sum item will be made at the unit price therefor only by reason of duly authorized changes. Adjustments of the contract amount due to any difference between the estimated and final quantities for unit price items will be based on a net deviation of the final quantities from the estimated quantities at the unit price bid therefor."

Quantities were listed in the Bid Form for paving the parking areas as follows:

Item 13.9—152,200 sq. yds. 2" asphalt surfacing @ 89¢ per sq. yd., $135,458.

Item 13.10—185,000 sq. yds. 1½" asphalt surfacing @ 73¢ per sq. yd., $135,050.

This sub-contract was apparently signed September 20, 1941. Mr. Hogan testified:

"I understood that because of temperatures the asphalt work could not commence until around March 1st."

Mr. Blair's contract with the government provided that the contracting officer acting on behalf of the United States could at any time by a written order make changes in the drawings or specifications of the contract, and within its general scope. Provision was also made for an equitable adjustment of the amount due under the contract necessitated by the change. On September 25, 1941, Mr. Hogan wrote the defendant Blair as follows:

"It has recently been brought to our attention that the awarding authority wished to change or remove the Hot-Mix surfacing from the parkways as was listed in the original plans. Furthermore, that they intended to use a clay bound compacted base with a prime oil surface as a substitute.

"This would materially affect our anticipated profits in this work and increase our proportionate costs or unit costs because of installation, overhead and the use of smaller equipment because on the reduced quantities which in turn would increase the unit labor cost.

"For this reason we feel that we should have an increase in price of ten cents (10¢) per square yard for the Hot-Mix asphalt surfacing as now specified on the roadways. Secondly, we feel that the specification requirements for plastic index, liquid limit, and the part of the specifications pertaining to the relation of the material governed by the 40 and 200 mesh screen should be eliminated from the gravel base used on the parkways and shoulders. This specification is for designing gravel bases carrying permanent surfaces whereby ground water can escape and also prevent failures by capillary attraction. However, where permanent surface is not desired these conditions are not advantageous as this type of material will not hold enough moisture to remain compacted and in a serviceable condition.

"As a third consideration we think the price made for the hauling and placing gravel which you would load in our vehicles should be increased twenty-five cents (25¢) per cubic yard for hauling and placing as under this present change, the stabilized base will also be eliminated and we will have a far less margin or profit in this item as it is in comparison to what was contemplated at the time of bidding.

"Trusting that you will take this up with the awarding authority and advise us immediately * * *."

This letter was answered on September 30, as follows:

"I am enclosing herewith copy of a letter dated September 30th, from the Constructing Quartermaster, stating that the motor park areas for the tank regiment shall consist of eight inches of clay bound gravel with an oil surface as a dust preventive, and the motor park area to consist of six inches of clay bound gravel with the same type of surface treatment.

"Your letter of September 25th was written with the advance information concerning the decisions mentioned above, and I will submit your statement concerning the effect this decision has upon your work. As soon as I will have received a reply I will inform you concerning the decision rendered.

"In the meantime you are to proceed with production of the clay bound gravel with the intention of placing it in the areas designated by my construction superintendent."

The letter from the Constructing Quartermaster is as follows:

"In accordance with a decision rendered in the office of the Quartermaster General, see attached telegram from same, the motor park areas for the tank regiment shall consist of eight inches of clay bound gravel with an oil surface as a dust preventative. The motor park area shall consist of six inches of clay bound gravel with same type of surface treatment. This is for your information."

The telegram referred to gives the same information.

On October 22, 1941, plaintiffs replied as follows:

"This is to acknowledge your letter of September 30th regarding the plan change in the parking areas by the Construction Quartermaster. It is also noted in your letter that you wish for placement of clay bound gravel to begin. Immediate plans will be made for the placing of clay gravel, and at this time I wish to determine if you wish to furnish any of this gravel to us F.O.B. our trucks as is your privilege by contract. It is necessary that this matter be decided at once as we wish to make permanent arrangements for producing the gravel for this work.

"I further note that you recognize in your letter our feeling toward this plan change and feel sure that you will present our condition to the Quartermaster as we see it."

On January 12, 1942, defendant Blair wrote to the plaintiffs as follows:

"I have received a request for a Change Order from the Area Engineer for changing the 24 foot and 20 foot bituminous paved roads within the Motor Park Areas to concrete, and making all gravel surfaces within the Motor Park Areas 8 inches thick throughout.

"This change reduces the square yard area of clay bound gravel surfacing, but in view of the added thickness and certain other additions such as the unpaved areas facing the center concrete road in front of the buildings it is believed that the total volume will be about equal to the original quantity.

"You were advised sometime ago that the asphalt surfacing in the Motor Park Areas would be omitted, and this Change Order makes the omission a definite fact.

"This information is given to you so that you can plan your equipment arrangements accordingly."

Mr. Hogan testified:

"That was the first decisive information I had that there would be a change of the parking areas from asphalt to concrete. I had some intimation of it before. I had to hold myself in readiness to produce 50,-000 tons of asphalt until I received this letter."

On June 19, 1942, Blair sent to plaintiffs a formal change order in compliance with the provisions of the contract that no extra work or changes under the contract would be recognized unless agreed to in writing before the work was done or the change made. Plaintiffs declined to accept or execute the change order and so notified defendant Blair by letter on June 22, 1942.

The elimination of paving from the parking areas reduced the contract price of $461,964 by the amount of $270,508. Because of the reduction in the quantity of asphalt, plaintiffs' fixed costs for renting, shipping, installing and equipping a larger plant than was necessary after the elimination of such a substantial part of the work, were increased as to the work remaining, resulting, it is claimed, in substantial loss.

■ Contracts for materials in building or constructing improvements may indicate that the one obligated to pay should pay only for the quantity of material actually going into the structure or improvement, whether that amount be great or small. On the other hand, quantities may be stated in a contract only as estimates, in which event the quantities actually used in the work control even though they fall short of the quantity stated as an estimate only. Hackett v. State, 103 Cal. 144, 37 P. 156; Sweet v. Vista Irr. Dist., 134 Cal.App. 518, 25 P.2d 512. If by law or contract the contractor agrees to variations in plans and thereby binds himself, a subcontractor may be bound to submit to alterations in plans, with the result that none of the parties may contend that their original contracts have been abrogated by the changes, although the result of compensation may vary materially by reason of the change. Sternberg Dredging Co. v. Dawson, 164 Ark. 24, 261 S.W. 286. So, too, the contract may show that the parties anticipated that the quantity of work would amount substantially to what is set forth. Gam-

mino v. Inhabitants, 1 Cir., 164 F. 593. The sub-contract between plaintiffs and defendant Blair reflects an intention to contract with reference to a certain piece of work requiring a quantity on which the parties have substantially agreed. The provision for additions and deductions at the unit prices is in fact an agreement for compensation in the event of a change. Setting forth the unit prices does not necessarily mean that the sub-contractor is merely to be paid for what in any event may be required. The reduction of .05¢ per square yard for additional work is explained by testimony that such work as called for could be done at a lower rate. The contract must be so construed as to give effect to Article 7 and if this be done it means that a substantial change in the work as contemplated could only be accomplished through agreement of the parties. We are referring to the contract between plaintiffs and defendant Blair. What is contained in the contract between Blair and the government relative to changes can not modify the explicit contract between these parties, especially since the defendant is protected by the provision in his contract with the government for an adequate adjustment in the event of change. It is also important in construing this contract to consider in connection with Article 7 the provision that the defendant will pay the sum of $461,964 "for said materials and work" when the task is completed. Defendants place great stress on the fact that plaintiffs agree to furnish all the materials and fully construct "all the items listed * * * as required in connection with my contract for construction and completion of the Armored Division Camp, Fort Smith (Barling) Arkansas * * * according to the plans and specifications (details thereof to be furnished as needed) of the War Department Architect, and to the full satisfaction of said Architect." The plans and specifications referred to are not in the record, but the trial court found as follows:

"* * * that it was not the intention of the parties to the contract that any substantial part of the work should be eliminated, and that the provision in the contract relied upon by the defendants has reference to the quantities used in performing the work under the various items of the contract; that the defendant Blair, was advised prior to the elimination of said portion of asphalt work that the plaintiffs in submit-

ting their bid for said work had figured and included therein an item of $69,381.74 as the cost to them of erecting an asphalt plant of sufficient size to manufacture the amount required under the contract as originally executed by the parties and that it would have been unnecessary for the plaintiffs to have erected an asphalt plant of the size and capacity and at such cost if the total amount as set forth in the contract was not to be supplied. That the fair proportionate excess cost of setting up the large asphalt plant was $30,000 and the plaintiffs are entitled to recover said sum under paragraph 11 of the complaint."

It may be that the plans and specifications were specific and definite as to the quantity of asphalt work required. We must so presume in view of this finding. Emphasis is also placed by defendants on the use of the word "required," but it is the duty of the court in construing this contract to ascertain the intention of the parties not from an isolated word or fragment of the contract but from the entire instrument. Carpenter v. Continental Casualty Co., 8 Cir., 95 F.2d 634. The word "required," as here used, simply means that that will be done or supplied which is called for by the contract. The provision that adjustment of the contract amount due to any difference between the estimated and final quantities is not controlling because it is clearly applicable only to those inadvertent errors or differences between careful and precise specifications and performance that will inevitably creep in where contracts involve vast amounts of labor and materials. It does not apply to a change of a substantial nature.

Defendants, however, insist that after breach, if there was a breach, plaintiffs accepted payments in substantial amounts and hence, must be held to have waived the breach. This, we think, does not follow. Where there has been a breach, the party not at fault may elect to continue performance and accept payment from the other party. If he does so, he manifestly waives his right to treat the contract as repudiated but he does not thereby waive his right to sue for damages sustained because of the breach. Purington Paving Brick Co. v. Metropolitan Paving Co., 8 Cir., 4 F.2d 676.

The amount of damages allowed is challenged by defendants. In support of the $30,000 allowed by the court it is pointed

out that in calculating their bid plaintiffs contemplated moving their large asphalt plant to the camp site. This large plant was to be moved because it is said 50,000 tons of asphalt would be required and the smaller plant at Fort Smith, Arkansas, would not produce that quantity within the time required. Plaintiffs submitted a calculation as follows:

| | |
|---|---:|
| "Rent on one Hetherington and Berner asphalt plant, capacity 500 tons per day, including boiler, storage tanks, pumps, pyrometers, automatic feeders, etc., $5,000.00 per month, or for six months | $30,000.00 |
| Rent on two Finishing machines, $600.00 per month each, or for six months.... | 7,200.00 |
| Rent on one yard Clam Shell shovel $800.00 per month, or for six months........ | 4,800.00 |
| Rent on four rollers $200.00 per month each, or for six months | 4,800.00 |
| Rent on distributor and Broom for priming $600.00 per month, or for six months | 3,600.00 |
| Cost of hand tools; including brooms, pick, shovel, etc.... | 2,000.00 |
| Sub-total ............ | $52,400.00 |
| Installation charge. (This charge will be certified if requested) ............. | 11,981.74 |
| Dismantling, including shipping and subject to arbitration when accomplished... | 4,000.00 |
| Approximate increase in dust cost .................... | 1,000.00 |
| | $16,981.74 |
| Grand total ............ | $69,381.74." |

The trial court found that in submitting their bid plaintiffs included an item of $69,381.74 as the cost of erecting an asphalt plant of sufficient size to manufacture the quantity of asphalt required under the contract as originally executed, and that defendant Blair was so advised. We have searched the record and find no evidence to sustain the finding that defendant Blair knew of this. The trial court found that the fair proportionate cost of setting up the large asphalt plant was $30,-000. We think the record does not sustain this finding.

Expenses incurred by a party in preparation for performance of a contract before its abandonment by the other party are proper elements of damages caused by the breach (Curran v. Smith, 3 Cir., 149 F. 945), and generally, where breach of a construction contract prevents performance, the damages are (1) what is expended toward the performance, and (2) profits that would have been realized by full performance. White River Levee Dist. v. McWilliams Dredging Co., 8 Cir., 40 F.2d 873. We do not see, in the circumstances disclosed by this record, how charges for rent of the machines can be allowed. The machines belonged to plaintiffs. They were to be used on the project. Their use on the work might have produced no net profits. Whether any profits would have resulted if plaintiffs had fully performed is left to pure speculation, which is not sufficient as a basis for damages. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168; White River Levee Dist. v. McWilliams Dredging Co., supra. As said by the Supreme Court in Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 78, 69 L.Ed. 265:

"One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract."

He is not, however, entitled to better his condition nor to profit by non-performance. We think there is a logical difference between expenses incurred and an allowance for the rent of machinery not in fact used, and there are practical reasons for allowing the one and rejecting the other. The contractor is out the expenses incurred by him, but whether he is out anything by not having used his machinery depends upon whether performance of the contract would have yielded any profit. The evidence here furnishes no answer for that question, and hence, it is not necessary to determine to what extent profit and expenses might be recovered. Wells v. National Life Ass'n, 5 Cir., 99 F. 222, 53 L.R.A. 33. It follows that the sum of $16,981.74, which appears to be the out-of-pocket expense, is, under the evidence, the measure of plaintiffs' recovery.

It is finally argued in defense to plaintiffs' right to recover on this item, that they were under a duty to use reasonable endeavor to reduce the damages. On this question the trial court made no express finding, but by allowing damages it presumably found that plaintiffs were not shown to have been in a position when the contract was breached, to further minimize the damages. In view of the evidence that on January 12, 1942, plaintiffs received a letter from defendant Blair in which he said that he had received a request from the Area Engineer for a change order which made the omitting of asphalt surfacing from the motor parking areas a definite fact, and the testimony of Hogan that this letter was the first decisive information he had that there would be a change from asphalt to concrete and that he had to hold himself in readiness to produce 50,000 tons of asphalt, the finding of the court in this respect can not be said to be erroneous.

The action of the court in allowing interest on unliquidated demands is urged as error. This has special reference to the damages for "speed-up." As we have reached the conclusion that there should be no damages for the "speed-up," the question becomes moot. It might be observed in passing, however, that the Supreme Court of Arkansas has decided that the allowance of interest on unliquidated claims is within the discretion of the trial court. Western Union Telegraph Co. v. T. C. Davis Cotton Co., 170 Ark. 506, 280 S.W. 977.

The cross-appeal of plaintiffs presents two questions. First is the right to recover damages for delay in preparing sub-grade, as alleged in paragraph 9 of their complaint. As to this claim the trial court found as follows:

"The court finds that certain changes in sub-grades were made by the engineers of the United States under whose final supervision the work was being done. Certain other delays were occasioned because of weather and other conditions over which the defendant Blair had no control, and that such delays as were occasioned to the plaintiffs and as complained of in paragraph 9 were the usual and customary delays that might be expected reasonably in the performance of such a contract, and the court further finds that the defendant, Blair, did not breach the contract as alleged by plaintiffs in paragraph 9 and are not entitled to recover any damages under said paragraph."

A detailed statement of the evidence in this regard would serve no useful purpose. The contract is an Arkansas contract governed by the law of that state. The Supreme Court of Arkansas holds that the parties contract with a view to the possibility of delay and if damages for delay are to be recovered the contract must contain an express provision to that effect. Brown & Froley v. Monroe County Road Improvement Dist., 153 Ark. 606, 241 S.W. 39. It is urged by the plaintiffs that the announcement of this rule by the Supreme Court of Arkansas was mere dictum. It is true that the trial court had found that gravel was furnished in that case, and the Supreme Court held that this was sustained by the evidence, so that even if the contract had contained a provision for damages for delay, the fact finding would preclude a recovery. A reading of the entire opinion, however, shows that this was given as an additional reason for affirming the trial court, and what is said as to the law was directed to a contention of the appellant, and hence, can not be considered dictum. Six Companies v. Joint Highway Dist., 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114.

The second question presented on the cross-appeal is based upon the court's denial of plaintiffs' right to recover damages for hauling asphalt from Fort Smith, Arkansas, as claimed in paragraph 12 of their complaint. The asphalt contract provides:

"It is agreed and understood that the Contractor will furnish sufficient trackage for the SubContractor on the site for his operations, and it is agreed and understood that he will be given three (3) weeks' notice in which to set up his asphalt plant and equipment to be used in the execution of his Contract."

Mr. Hogan testified that prior to getting his large asphalt plant in operation he was requested to furnish this asphalt. This was during the "speed-up" operations and about the time the troops were due to arrive at the camp. In compliance with this request he procured this asphalt at the Fort Smith plant. He testified that, "We thought we would be refunded for it just the same as we were our other extra costs in this speed-up program." Regardless of the "speed-up" program, the evidence shows without dispute that the three weeks'

notice required by the contract was not given. The haul from the asphalt plant as it was set up was two miles, while from Fort Smith the haul was eight miles. The difference in cost is shown to have been $2,570.75 because of the longer haul. The contract obligated the defendant Blair to give a three weeks' notice. The supplying of the asphalt was therefore not pursuant to the contract, and we think recovery should be allowed on the basis of quantum meruit as an added expense.

That part of the judgment appealed from is therefore modified so as to permit a recovery of three items: $10,360.76, $16,981.74, and $2,570.75, amounting in the aggregate to $29,913.25, with interest from September 3, 1942, at 6 per cent per annum, and the cause is remanded to the lower court with directions to modify the judgment accordingly. Neither of the parties shall recover costs on these appeals.

JOHNSEN, Circuit Judge (dissenting in part).

I am unable to agree that the recovery on paragraph 11 of the complaint should be modified. In that paragraph the subcontractor sought to recover damages resulting from the cancelation of about 60% of the asphalt work in his contract, which reduced by $207,508 the total of $461,964 which he was to have received for full performance. Instead of attempting to recover for his loss of profits on the canceled work, he merely sought to be made whole for the costs or expenses and other losses which he had sustained in having prepared to do the work.

These costs or expenses and other losses consisted (1) in having dismantled, shipped, and set up at the place where the contract was to be performed, and being ultimately obliged to return, an asphalt plant of larger capacity than otherwise would have been necessary or would have been committed to the job; (2) in having committed to the job also other excess equipment and machinery, which similarly was necessary to the performance of the contract as made, but which too was not usable, or usable to capacity, when the amount of the asphalt work was reduced, and which likewise would not have been thus committed except for full performance needs; and (3) in having lost the rental value of this excess equipment, which could have been rented to other contractors, if

it had not been committed to his full contract performance.

The opinion of the majority holds that the subcontractor is entitled to his out-of-pocket costs or expenses in dismantling, shipping, setting up, and returning the excess-capacity asphalt plant and the other equipment which was unneeded as a result of the partial cancelation, but that he is not entitled to recover the rental value of its use for the time that it had been obliged to be thus idly tied down to the job. To me the loss of the use of the excess equipment on other jobs and the rental value which the subcontractor could have received therefor, if it had not been committed to the performance of the canceled contract-work, are just as real and direct damages as any rental payment made by him on someone else's equipment would have been, which would have been recoverable under the opinion.

If the subcontractor had sought to recover loss of profits on the canceled work, instead of foreseeable special and limited damages from having prepared to carry out his contract and having been prevented from doing so, he would have been required under Arkansas law to have included the reasonable rental value of his equipment as a cost or expense item in arriving at his profits, even though he was the owner of the equipment. Singer Mfg. Co. v. W. D. Reeves Lumber Co., 95 Ark. 363, 129 S.W. 805. The present case seems to me merely to involve an application of this principle in transposition.

Arkansas also has specifically recognized in a number of cases—though they are not immediately in point on their facts or legal situations—that the rental value of property necessarily may be the basis for awarding contract damages, where there clearly has been an injury from a breach and rental value appears to afford the fairest and soundest standard of compensating for it. Dilday v. David, 178 Ark. 898, 12 S.W.2d 899; Lamkins v. International Harvester Co., Ark., 182 S.W.2d 203; and see also St. Louis, I. M. & S. R. Co. v. Saunders, 85 Ark. 111, 107 S.W. 194.

Restatement, Contracts, § 331(2), states the general rule thus: "Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by

the rental value of the property or by interest on the value of the property." See also 5 Williston on Contracts, Rev.Ed., § 1346A.

This principle has perhaps most commonly been applied to a situation where a contractor has failed to complete a building on time. See 125 A.L.R. 1242, 1244, Annotation. But I can see no difference, so far as the right to damages is concerned, between a situation where the owner of a building has been prevented from making a profitable use of his building and one where the owner of machinery and equipment has been prevented from making a profitable use of his machinery and equipment. By the tying up of machinery and equipment which has a rental value, the rental value certainly has been as much lost as by the tying up of a building.

I think that the aggregate amount allowed by the trial court as damages for the costs or expenses incurred in making the excess equipment available, and for the rental value of such excess equipment while it was necessarily tied to the job, should be allowed to stand.