Stanley Brown v. Maryland Casualty Company, et al

5-4723                                     442 S.W. 2d 187

Opinion Delivered May 26, 1969
[Rehearing denied July 14, 1969.]

*Acchione & King* for appellants.

*S. Hubert Mayes, Jr.* for appellee (Maryland Cas.).

*Clark, Clark & Clark* for appellee (Con-Ark.).

JOHN A. FOGLEMAN, Justice.   The Housing Authority of Pike County, Arkansas, contracted with Plez Lewis & Son, Inc., for the construction of a housing project according to plans and specifications prepared by architect Stanley Brown.   After Plez Lewis defaulted, the housing authority called upon Maryland Casualty Company, surety on the contractor's performance bond, to complete the contract.   Maryland contracted with Con-Ark Builders, Inc., to complete the construction in accordance with the original plans.   Apparently, it was contemplated that a change would be made in the plans and specifications as to foundations, because mention of this was made in the contract between Maryland and Con-Ark.   After Con-Ark. took over, "Change Order G-2" was added requiring the installation of 124 piles, a minimum of ten feet in length or a total of 1,240 lineal feet. Con-Ark's proposal to Maryland had contained an item of $6,500 for this work plus $4.75 per foot in excess of 1,240 feet.   Con-Ark subcontracted this work to Piling & Repairs, Inc., for $5,084 plus $3.85 for each additional lineal foot.   After the piling work started, R. W. Laird, the architect's representative on the job site, instructed Piling & Repairs' workmen to drill the pilings deeper than the originally specified ten feet.   Accordingly, this resulted in an additional 1,268 lineal feet of drilling over the original specification of 1,240 lineal feet.

Piling & Repairs, who had been paid by Con-Ark for a portion of the overrun, brought suit against Con-Ark for the balance due on the overrun.   Con-Ark admitted the overrun and cross-complained against Mary-

land Casualty Company on the premise that should Con-Ark be liable to Piling & Repairs, Con-Ark should have judgment against Maryland. Maryland then cross-claimed against the housing authority and Stanley Brown and R. W. Laird seeking judgment against them, jointly and severally, for any amount for which it was held liable.

At the trial it was stipulated that Stanley Brown was the housing authority's agent and that Laird was Brown's agent.

The trial court entered judgment for Piling & Repairs against Con-Ark as prayed, for Con-Ark against Maryland Casualty Company as prayed, and for Maryland against the housing authority, Stanley Brown and R. W. Laird, jointly and severally, for anything Maryland might be required to pay to satisfy the judgment in favor of Con-Ark. Brown and Laird filed notice of appeal. Con-Ark gave notice of appeal from the judgment in favor of Piling & Repairs. The appeal by the housing authority was designated as a cross-appeal in the sense used in Ark. Stat. Ann. § 27-2106 (Repl. 1962), *Brown v. Maryland Casualty Co.*, 245 Ark. 70, 431 S.W. 2d 258. Maryland also appealed.

Maryland contends that it is not liable to Con-Ark unless and until it is paid for the extra work by the housing authority and its architect. Under the terms of the contract between Con-Ark and Maryland allowance of the amount to be paid by the owner was a condition precedent to payment from Maryland to Con-Ark. The pertinent contract portions are as follows:

"7. Maryland agrees to pay the Contractor, as full compensation for all liability assumed hereunder, the sum of $109,500.00, *subject to additions and deductions resulting from change orders or extras issued by the Owner,* to be paid as follows:—
a. The sum of $101,729.83, being the balance of the

Contract price remaining under the said Contract between Lewis and the Owner, out of the estimate and retained percentages to be received by Maryland from the Owner periodically, as provided for in the Contract between Lewis and the Owner, for work performed by the Contractor, and to be paid to the Contractor within five (5) days after receipt thereof by Maryland, such payment to be in like amounts as Maryland receives from the Owner.

b. The additional sum of $7,770.17 * * *

c. Within five (5) days after receipt by Maryland from the owner of any payment to it *for extra work ordered, including but not limited to contemplated change in foundations,* on or after the effective date of this AGREEMENT and performed by the Contractor, *Maryland will make payment of an amount equal to the amount received by Maryland from the Owner for the aforesaid extra work.*

d. Within five (5) days after the Owner notified Maryland in writing that the Contract has been completed and accepted and the Owner has paid the final estimate and retained percentage to Maryland, then Maryland will pay to the Contractor the balance due under this AGREEMENT, if any. *It is distinctly understood and agreed by the parties hereto that the payments provided for hereunder are to be made only after Maryland receives from the Owner the estimate* payments, *payments for extras and changes,* and retainages to be paid to Maryland by the Owner and Lewis. *It is further understood and agreed that the payments shall, in no event, exceed the sum of* $109,500.00, *subject to any additions or deductions provided for hereunder. . Any change or increase in the amount*

> *of this AGREEMENT hereinafter provided for*
> *shall be paid to the Contractor only in such*
> *amount as is allowed therefor by the Owner,*
> *anything in this AGREEMENT to the contrary*
> *notwithstanding.*

It is understood that the payments provided for as above are to be made only after Maryland receives from the Owner the estimate payments, the payments for extras and changes, and retainages to be paid Maryland by the Owner under the terms of its Contract with Lewis, provided, however, that should the Owner withhold any estimate payment, payment for extras, or retainage for a period of twenty (20) days beyond the time it would normally be paid because of any reason not the fault of the Contractor, then Maryland shall nevertheless make payment to the Contractor for any such estimate, extra, or retainage earned by the Contractor and without awaiting payment from the Owner, as provided for in subparagraphs a, b, and c; provided further, however, that should the Owner withhold any payment herein referred to for a period of twenty (20) days beyond the time it would normally be paid, for reasons not the fault of the Contractor, then Maryland shall have the right to cancel this AGREEMENT upon notice to the Contractor. In the event of such cancellation, the Contractor shall be entitled to payment from Maryland for all amounts earned by the Contractor, including retainage under this AGREEMENT, up to the date of cancellation.'' (Emphasis ours.)

It is obvious that all parties knew that this was an undertaking to complete a job on which the original contractor had defaulted. Con-Ark was Maryland's subcontractor for the completion of the work. There is no reason why the parties could not contract for this work on any terms they agreed upon. There is no reason

why the terms of the contract which both parties agreed to should not be enforced.

In *Blair* v. *United States,* 147 F. 2d 840 (8th Cir. 1945), there was a contract between a contractor and a subcontractor which contained provisions very similar to those in this case. A fixed completion date in the contract between the government and Blair, the general contractor, had been extended. By a later supplemental contract, this date was advanced to the original one, upon agreement of the government to reimburse Blair for additional costs resulting from the reduction of time on the basis of expenditures approved by the government's contracting officer. Blair notified his subcontractors that they were committed to the original completion date, " 'with additional compensation as approved by the Government being granted you where applicable, in accordance with Article II of attached Supplemental Agreement.' " In reversing a judgment in favor of the subcontractor, the court said:

"* * * The above quoted letter discloses not a promise by Blair to pay, but that additional compensation as approved by the government would be granted where applicable. This implied a promise that Blair would turn over funds if and when realized by allowance and payment by the government. As such payment has not been received by him and no claim is made that he has not diligently attempted to make collection, and it affirmatively appears that he has done so, defendant should not be held liable contrary to the terms of his agreement. * * * (Citations omitted.) We conclude that plaintiffs were not entitled to recover on account of the speed-up agreement though they may be entitled to such recovery dependent upon whether or not defendant Blair received additional compensation from the government on account of the adjustment in the date of the completion of the work under his contract."

The rule stated there is applicable to this situation. There is no escape from the conclusion that, as to changes adding to the contract price, the liability was not absolute but conditional. While some of the clauses of the contract might be construed as only fixing a time for payment of an absolute liability, the provision of Section 7 d that any change or increase be paid to Con-Ark "only in such amount as allowed therefor by the Owner, anything in this AGREEMENT to the contrary notwithstanding" can only create a liability conditional upon approval of the change by the owner.

Language contained in *Mascioni* v. *I. B. Miller, Inc.,* 261 N.Y. 1, 184 N.E. 473 (1933) is pertinent. In that case, the contractor agreed to pay a subcontractor 55 cents per cubic foot for erection of concrete walls. The promise to pay contained the proviso "Payments to be made as received by the Owner." The court reversed a holding by the appellate division that this provision merely fixed the time of payment and did not create a condition precedent. That court said:

> "A provision for the payment of an obligation upon the happening of an event does not become absolute until the happening of the event. Whether the defendant's express promise to pay is construed as a promise to pay 'if' payment is made by the owner or 'when' such payment is made, 'the result must be the same; since, if the event does not befall, or a time coincident with the happening of the event does not arrive, in neither case may performance be exacted.' * * *

> True, a debt with consequent obligation to pay may exist aside from any express promise to pay. Then a condition annexed to an express promise to pay the debt may render the promise to pay conditional without making the debt subject to the same condition. 'It must be admitted, however, that a condition annexed to a promise to pay a debt will

commonly, upon the true construction of the instrument in which it is contained, extend to the debt itself. There is a difference also between a promise to pay a debt on a certain condition, and a proviso that the debt shall be payable only upon a certain condition; for the latter necessarily renders the debt itself conditional.' Langdell, Summary of the Law of Contracts, § 36. In this case, if there were no express promise to pay a stipulated price for stipulated work, such a promise would be implied. There is, however, an express promise to pay moneys 'as received from the Owner,' and the event upon which that promise would ripen into an absolute, immediate obligation has not occurred. From the express promise to pay upon the happening of an event, an inference may be drawn that the parties did not intend or impliedly agree that payment should be made even if the event does not occur.

In many cases, nevertheless, an inference that an express promise to pay a debt on a certain condition excludes an implication that the debt shall be paid, even though performance of the condition is impossible, would defeat the intention of the parties. The tests approved by the Law Institute in its Restatement of the Law of Contracts, § 295, are whether '(a) a debt for performance rendered has already arisen and the condition relates only to the time when the debt is to be discharged, or (b) existence of the condition is no material part of the exchange for the promiser's performance, and the discharge of the promiser will operate as a forfeiture.' In either case 'impossibility that would discharge the duty to perform a promise excuses the performance of a condition.'

Here on its face the contract provides for a promise to perform in exchange for a promise to pay as payments are 'received from the Owner.' Performance by the plaintiff would inure directly

to the benefit of the defendant, because the defendant had a contract with the owner to perform the work for a stipulated price. The defendant would not profit by the plaintiffs' performance unless the owner paid the stipulated price. That was the defendant's risk, but the defendant's promise to pay the plaintiffs for stipulated work on condition that payment was received by the defendant shifted that risk to the plaintiffs, if the condition was a material part of the exchange of plaintiffs' promise to perform for defendant's promise to pay."

The principle is succinctly stated in 17 Am. Jur. 2d, Contracts, § 339:

"There is a difference between a promise to pay a debt on a certain condition, and a provision that the debt shall be payable only upon a certain condition, for the latter necessarily renders the debt itself conditional. Although a condition annexed to an express promise to pay a debt may render the promise to pay conditional without making the debt subject to the same condition, a condition annexed to a promise to pay will commonly be construed to extend to the debt itself."

It has been recognized and applied by this court as illustrated by the following language from *Jacks* v. *Phillips County*, 25 Ark. 64:

"The proposal made by Jacks to the county court, and which was accepted, was, that Jacks was to receive for his services one-half of the money collected off of the lands which he might ascertain to have been omitted in the late assessment of the county taxes; and this right to compensation depended upon the performance of his contract, by ascertaining the omitted lands and bringing them upon the assessor's list, and that money had been received in payment of taxes on the lands so ascertained and assessed. Then, and not until then, would he have

> a right to claim of the county one-half of the money collected; because his contract was conditional, and his right to compensation depended upon his performance of his contract, and the collection of the money.''

The above stated principle is applicable to this case. Consequently the judgment against Maryland is reversed.

Inasmuch as the judgments in favor of Maryland and against Brown, Laird and the housing authority were made dependent upon the amount which was paid by Maryland on the judgment in favor of Con-Ark, those judgments must be reversed also, in spite of the fact that we could dismiss the appeal of the housing authority or affirm the judgment against it because of its failure to file a brief on cross-appeal. See Rule 10; *Dunham* v. *Phillips,* 154 Ark. 87, 241 S.W. 361; *Day* v. *Langley,* 202 Ark. 775, 152 S.W. 2d 308. These judgments were void as conditional judgments in any event. *Bank of Commerce* v. *Goolsby,* 129 Ark. 416, 196 S.W. 803; See also *Brotherhood of Locomotive Firemen and Engineers* v. *Simmons,* 190 Ark. 480, 79 S.W. 2d 419.

It is necessary that we consider the appeal by Brown and Laird, because, on a retrial, they might be held liable to Maryland for any amounts for which Maryland could not recover from housing authority because of any actions taken by them without authority from the principal. Under the evidence hereinafter set out and the finding of the trial court thereon, Laird could not be liable to Maryland. Its cross-complaint against him is dismissed.

The trial court found that Laird was Stanley Brown's agent, that Stanley Brown was the housing authority's agent, and that the agents had either the actual or apparent authority of the housing authority to require the additional piling, in spite of evidence that Laird had exceeded his authority. The trial court found

that the actions of Laird had been ratified by Brown. There is substantial evidence to support this finding in the testimony of W. S. Little, field engineer for Brown. Little stated that before the drilling was more than one-half completed he discovered that the drilling was beyond the depth specified in the change order. He reported this fact to Brown but did not stop the work. There was testimony by Kennedy, the construction superintendent for Con-Ark, that Mr. Little also took part in telling him whether or not the holes drilled for piling were deep enough. It was Kennedy's recollection that Little came on the job about May 13[1] and remained for two or three days. He testified that Little was telling him to go to refusal during that time. Kennedy stated that Little was aware of the additional depth to which these drillings were being made. The authorities consistently hold that where an agent is duly constituted, names his principal, contracts in the principal's name, and does not exceed his authority, the principal is responsible on the contract and not the agent. *Neely* v. *State,* 60 Ark. 66, 28 S.W. 800; *Dale & Banks* v. *Donaldson Lbr. Co.,* 48 Ark. 188, 2 S.W. 703; *McCarroll Agency Inc.* v. *Protectory For Boys,* 197 Ark. 534, 124 S.W. 2d 816; *Ormsby* v. *Kendall,* 2 Ark. 338; *Ogletree* v. *Smith,* 176 Ark. 597, 600, 601, 3 S.W. 2d 683; *Meier* v. *Hart,* 143 Ark. 539, 541, 542, 220 S.W. 819; *Ferguson* v. *McMahon,* 52 Ark. 433, 12 S.W. 1070. A principal, knowing of the acts of his agent, or of facts putting him on notice thereof, who fails to object cannot be heard to deny the agency but will be held to have acquiesced in and ratified his acts. *St. Louis-San Francisco Railway Co.* v. *Lee Wilson Co.,* 212 Ark. 474, 206 S.W. 2d 175; *American Mortgage Co.* v. *Williams,* 103 Ark. 484, 145 S.W. 234.

The authority of an architect as the owner's agent is limited. He may not direct that the work be done in any manner other than set out in the plans and specifica-

---

[1]Testimony indicated that drilling started May 10 and was completed on May 19.

tions, except as he has been given authority to do so in the contract. *Incorporated Town of Bono v. Universal Tank & Iron Works*, 239 Ark. 924, 395 S.W. 2d 330. Since there is no evidence in the record to show Brown's actual or apparent authority to bind housing authority or to show that the housing authority knew of Brown's or Laird's actions, we are unable to say whether Brown or Housing Authority, or either of them, is liable to Maryland. Housing Authority liability to Maryland is dependent upon its contract with Maryland and its contract with the original contractor or upon the extent of the architect's actual or apparent authority. Since the record is deficient in these respects, we remand Maryland's cross-complaint against Brown and the housing authority for a new trial.

The appeal by Con-Ark from the judgment against it in favor of Piling & Repairs is without merit. There is nothing to indicate that the compensation of Piling & Repairs depended upon recovery by Con-Ark from Maryland. The contract provided for a fixed compensation. The only contingency was the depth of the drilling for the piling for which Piling & Repairs was to be paid $3.85 for each additional foot. There was evidence that the President of Con-Ark approved the additional drilling by Piling & Repairs and assured them of payment for the additional footing. That judgment is affirmed.

Remanded for further proceedings consistent with this opinion.

HOLT, J., not participating.

GEORGE ROSE SMITH and BYRD, JJ., dissent.

CONLEY BYRD, Justice. In dissenting I wish to point out that the majority opinion mistakenly classifies the contract between Con-Ark and Maryland Casualty Co. as a conditional liability rather than an absolute liability. In so classifying the contract as a conditional lia-

bility it erroneously describes the contract here involved as being similar to the one in *Blair* v. *United States,* 147 Fed. 2d 840 (8th Cir. 1945).

The record here shows that Con-Ark had no contract with the Housing Authority. Con-Ark's only contract was with Maryland Casualty Company. The majority opinion quotes a portion of the original contract between Con-Ark and Maryland with respect to payment, but since it omits what I consider an essential part of the contract I am setting forth the portion quoted in the original contract together with that succeeding portion omitted from paragraph no. 7 of the contract.

> "c. Within five (5) days after receipt by Maryland from the owner of any payment to it for extra work ordered, including but not limited to contemplated change in foundations, on or after the effective date of this AGREEMENT and performed by the Contractor, *Maryland will make payment of an amount equal to the amount received by Maryland from the Owner for the aforesaid extra work.*

> "d. Within five (5) days after the Owner notifies Maryland in writing that the Contract has been completed and accepted and the Owner has paid the final estimate and retained percentage to Maryland, then Maryland will pay to Contractor the balance due under this AGREEMENT, if any. It is distinctly understood and agreed by the parties hereto that the payments provided for hereunder are to be made only after Maryland receives from the Owner the estimate payments, payments for extras and changes, and retainages to be paid to Maryland by the Owner under the terms of the Contract between the Owner and Lewis. It is further understood and agreed that the payments shall, in no event, exceed the sum of $109,500.00, sub-

ject to any additions or deductions provided for hereunder. Any change or increase in the amount of this AGREEMENT hereinafter provided for shall be paid to the Contractor only in such amount as is allowed therefor by the Owner, anything in this AGREEMENT to the contrary notwithstanding.

"It is understood that the payments provided for as above are to be made only after Maryland receives from the Owner the estimate payments, the payments for extras and changes, and retainages to be paid Maryland by the Owner under the terms of its Contract with Lewis, *provided, however, that should the Owner withhold any estimate payment, payment for extras, or retainage for a period of twenty (20) days beyond the time it would normally be paid because of any reason not the fault of the Contractor, then Maryland shall nevertheless make payment to the Contractor for any such estimate, extra, or retainage earned by the Contractor and without awaiting payment from the Owner, as provided for in subparagraphs a, b, and c;* provided further, however, that should the Owner withhold any payment herein referred to for a period of twenty (20) days beyond the time it would normally be paid, for reasons not the fault of the Contractor, then Maryland shall have the right to cancel this AGREEMENT upon notice to the Contractor. In the event of such cancellation, the Contractor shall be entitled to payment from Maryland for all amounts earned by the Contractor, including retainage under this AGREEMENT, up to the date of the cancellation.

The testimony of Mr. Charles Nabholz was that the specification upon which the original contract was drawn made no provisions for any pilings to be placed as foundation for the structures to be built on. He said that after they made the original agreement to complete the project, a new order came out to put in 1240 ft. of pilings

and that they submitted to Maryland Casualty Co. the following bid:

"Maryland Casualty Company
c/o Edward Corrington
325 Waldron Building
Little Rock, Arkansas

"Re: Glenwood
Ark Project 45-3

"We propose to furnish labor and material to install concrete piles as per drawings by Stanley Brown sheets A-2, A-4, A-6, A-7 revised showing concrete piles for the sum of $6,500.00 to be added to our base bid of $109,500.00 on the above referred job.

"This price is based on 124 piles 10' deep. In event there is an overrun the price will be 4.75 per ft. In the event there is a underrun the credit will be at 4.00 per ft.

"Respectfully submitted,

"Charles Nabholz, President
Con-Ark Builders, Inc."

At page 168 of the record Mr. Nabholz testified as follows:

"Q. You had authorization from Maryland for payment on overrun in April of '65, is that correct?

"A. That's right."

That the contract in *Blair* v. *United States*, 147 Fed. 2d 840 (8th Cir. 1945), is not similar to the contract here involved can readily be demonstrated by quoting the full paragraph from which the majority opinion takes a partial quote on page 3. The full paragraph in the Blair opinion is as follows:

"There is no evidence of any verbal contract by which Blair agreed to pay plaintiffs for extra expense incurred as a result of the "Speed-up Agreement." The above quoted letter discloses not a promise by Blair to pay, but that additional compensation as approved by the government would be granted where applicable. This implied a promise that Blair would turn over funds if and when realized by allowance and payment by the government. As such payment has not been received by him and no claim is made that he has not diligently attempted to make collection, and it affirmatively appears that he has done so, defendant should not be held liable contrary to the terms of his agreement. *Thomson* v. *Leak,* 135 Cal. App. 534, 27 P. 2d 795; *Wheat* v. *Platte City Ben. Assessment Special Road Dist.,* 227 Mo. App. 869, 59 S.W. 2d 88; *Cowan* v. *Browne,* 63 Mont. 82, 206 P. 432. We conclude that plaintiffs were not entitled to recover on account of the speed-up agreement though they may be entitled to such recovery dependent upon whether or not defendant Blair received additional compensation from the government on account of the adjustment in the date of the completion of the work under his contract."

In 17 Am. Jur. 2d, *Contracts,* § 339, the promise to pay upon a specified event or condition is discussed as follows:

"§ 339. Promise to pay upon specified event, condition, or contingency; payment out of particular fund.

"Where an instrument purports to be payable upon the happening of a certain event, the question which must precede any inquiry as to the time of payment, assuming that the event has not happened, is whether the instrument imports an absolute liability. If the event is one that is CERTAIN to happen, the mere promise to pay may import such an

absolute liability. If, however, the event is one WHOLLY or PARTIALLY within the promisor's control and therefore not certain to happen, the absolute character of the liability cannot be inferred from the mere promise, but must be sought in the other terms of the instrument or in extrinic circumstances. Thus, the mere fact that the party promised to pay a certain amount when he sold a piece of land is not conclusive of the fact that there was an absolute liability.

"The real significance of the provision that the instrument is payable upon the happening of an event that is wholly or partially within the control of the promisor is apparent after it has been determined whether the debt is an absolute one. If the instrument, read in the light of the surrounding circumstances, shows that the debt is an absolute one, it is reasonable to suppose that the parties intended that a reasonable effort should be made to cause the event to happen within a reasonable time. Some courts declare broadly that where payment is to be made upon a condition under the control of the promisor, an action may be brought within a reasonable time. Moreover, where a debt is due and the happening of a future event is fixed on merely as a convenient time for payment, but the future event does not happen as contemplated, the law implies a promise to pay within a reasonable time. Thus, to an agreement to *pay as soon* as a crop can be sold or the money raised from any other source the law annexes as an incident that one or the other shall be done within a reasonable time and that the sum admitted to be due shall be paid accordingly. In such a case payment is not conditional to the extent of depending wholly and finally on the alternatives mentioned, but the stipulation merely secures to the debtor a reasonable amount of time within which to procure in one mode or another the means necessary to meet the liability. However, it appears to be the

general rule that a promise to pay out of a particular fund does not create an absolute liability, in the absence of facts or circumstances showing the contrary. Accordingly, where a contract requires payment from a particular fund, it cannot be said that the debt is payable in a reasonable time where the source fails without the fault of the promisor. Nevertheless, where the promise is to pay out of a fund to be realized in a certain way, there is an implied obligation to use reasonable diligence in performing the act upon which payment is contingent. In default of such diligence, payment becomes due without performance of the condition.

"In some instances the money is made payable within a specified time after the happening of a certain event, such as the return of a specified vessel, which it is assumed will certainly occur. The fact that the vessel is lost at sea does not prevent the money from being payable within the time stipulated after the expiration of the period usually required for the return trip of the vessel. If a party puts it out of his power to cause the event to happen, his liability accrues at once.

"There is a difference between a promise to pay a debt on a certain condition, and a provision that the debt shall be payable only upon a certain condition, for the latter necessarily renders the debt itself conditional. Although a condition annexed to an express promise to pay a debt may render the promise to pay conditional without making the debt subject to the same condition, a condition annexed to a promise to pay will commonly be construed to extend to the debt itself."

The complaint of Piling and Repairs was filed in the Circuit Court on Dec. 11, 1965, the case was tried on Dec. 4, 1967, and the judgment was filed on Jan. 2, 1968. Thus, under the terms of the contract between Con-Ark and

Maryland, it is obvious that the owner has withheld the payment of the extras in excess of twenty (20) days beyond the time it would normally be paid. For these reasons I contend that Maryland's liability to Con-Ark is an absolute liability and that having performed the work in April of '65, Con-Ark was certainly entitled to receive its pay in Jan. of '68. In Maryland Casualty Company's pleading on page 32 of the record it acknowledges that the additional work has been accepted by the Housing Authority.

FURTHERMORE, I would affirm the judgment *in toto* including the judgment against Stanley Brown and the Housing Authority. I would affirm the judgment against the Housing Authority because it has waived any errors with respect to the judgment against it by failing to file briefs here within the time allowed. The record at pages 166 and 167 shows that the bid price submitted to the Housing Authority for the additional work contained no provision for the overage and underage as was contained in Piling and Repairs contract. Based on this contract, the Housing Authority relied upon a provision in its contract that no contractual changes should be binding on the Housing Authority unless provided for in writing prior to making such changes. In its complaint, Maryland Casualty Co. in paragraph 3 pleaded as follows:

> "Maryland Casualty Company denies that it is liable to Plaintiff or Third Party Plaintiff in any amount, but states that should it be found liable to Third Party Plaintiff in any amount for the cost of additional pilings in excess of 1,240 lineal feet or an amount in excess of $6,500.00, that it should have and recover such sum from Housing Authority of Pike County, Arkansas; Stanley Brown, Architect, and R. W. Laird, jointly and severally."

Recognizing that there was a contention that Stanley Brown did have authority to authorize the additional

work, Maryland Casualty Co. pleads in paragraph 6 of the complaint as follows:

"In the alternative, should Maryland Casualty Company be required to pay Third Party Plaintiff any sums in excess of $6,500.00 for said piling work and should it be determined that the Housing Authority of Pike County, Arkansas is not liable to Maryland Casualty Company for such sums, Maryland Casualty Company should have and recover judgment over and against and be fully reimbursed and indemnified for such sums by Stanley Brown, Architect, and his agent, servant and employee, R. W. Laird, for reason that said work was performed under their specific instructions and directions, both oral and written, at a time and place when they had actual and apparent authority to authorize same, or held themselves out to have such authority."

At the trial Stanley Brown, Architect, called the manager of his Little Rock Office, Mr. George Dowling, who testified that Laird, the man who authorized the extra piling, did not have the actual authority to authorize any excess drillings. He further stated that Laird had told him he did not take such authority. In addition to George Dowling, Stanley Brown called his structural engineer Ronnie Snowden, who testified that the extra piling work done was not called for by their plans and specifications and that from the standpoint of utility the extra piling added nothing to the buildings.

My understanding of the law is set forth in *Ormsby & Abraham Hite* v. *Kendall,* 2 Ark. 338, 344 (1839), as follows:

"... The principle is well settled, that if a person undertakes to contract as an agent for an individual or corporation, and contracts in a manner which is not legally binding upon his principal, he is personally responsible. *White* v. *Skinner,* 13 J. R. 307; *Randall* v. *Van Vechten,* 19 J. R. 60; *Taft* v.

1094

· *Brewster*, 9 J. R. 334; *Tippetts* v. *Walker*, 4 Mass. R. 596; and *Mott* v. *Hicks*, 1 Cowen 536.   The agent, when sued upon a contract, can only exonerate himself from responsibility by showing his authority to bind those for whom he is undertaking to act.   It is not for the plaintiff to show that he has not authority.   The application of this principle to the case now under consideration clearly proves that Kendall is personally responsible, and not the steamboat owners.   He was bound to show that he had authority to contract for the steamer Tecumseh and owners, and to prove this affirmatively, and in failing so to do, he becomes himself personally liable upon his undertaking ..."

·  · The architect, Stanley Brown, acting through his agent Laird, authorized the extra work resulting in this litigation.   If I correctly read the *Ormsby* case, the architect became personally responsible unless he showed that he had authority to contract for the extra work and that the burden of proof was on him to do so.   Not only did he not do so here but he affirmatively stated that he had no such authority.

Therefore I would affirm the judgment of Con-Ark against Maryland on the basis that it was an absolute liability which was due at the time of trial.   I would also affirm Maryland Casualty Company's judgment against the Housing Authority by virtue of the Housing Authority not having filed its brief within the time allowed by law.   I would also affirm the judgment against the architect because he stated that his agent had no authority from the Housing Authority to authorize the extra work.   I am at a loss to see how the architect could take one position in the trial court and a different position on appeal.

For the reasons stated I respectfully dissent.

GEORGE ROSE SMITH, J., joins in this dissent.